2007-NMSC-058

172 P.3d 138

STATE of New Mexico,
Plaintiff–Appellee,

v.

Robert YOUNG and Reis Lopez,
Defendants–Appellants,

and

Office of the Public Defender,
Real Party in Interest.

No. 29,467.

Supreme Court of New Mexico.

Oct. 25, 2007.

Kennedy & Han, P.C., Paul J. Kennedy, Law Offices of Billy R. Blackburn, Billy Ray Blackburn, Albuquerque, NM, Gerald Baca, Las Vegas, NM, for Appellant Robert Young.

Elizabeth Mercer, Jacquelyn Robins, Romero & Associates, P.A., Joe M. Romero, Jr., Inocente, P.C., Brian A. Pori, Albuquerque, NM, for Appellant Reis Lopez.

Gary K. King, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Michael D. Cox, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Nancy M. Hewitt, Appellate Defender, Santa Fe, NM, for Real Party in Interest.

**2**

Jones, Snead, Wertheim & Wentworth, P.A., Jerry Todd Wertheim, Santa Fe, NM, Freedman, Boyd, Daniels, Hollander, Goldberg & Ives, P.A., Theresa Duncan, Melissa Hill, Corrales, NM, UNM School of Law, Barbara E. Bergman, Albuquerque, NM, for Amici Curiae.

National Association of Criminal Defense Lawyers and New Mexico Criminal Defense Lawyers Association, for Respondent.

## OPINION

CHÁVEZ, Chief Justice.

{1} The issue in this case is whether indigent defendants accused of capital crimes are unconstitutionally deprived of effective assistance of counsel when their counsel are inadequately compensated. Under the specific facts and circumstances of this case, we find that counsel for the defendants are inadequately compensated, and as such defendants are deprived of the effective assistance of counsel. Defendants have asked us to consider three different remedies: (1) allow their attorneys to withdraw; (2) order the State to compensate counsel at a reasonable hourly rate; or (3) dismiss the death penalty. Exercising our constitutional and inherent supervisory jurisdiction to fulfill our duty to ensure that the criminal justice system is functioning in a constitutional manner, we order a stay of the prosecution of the death penalty in this case. The stay will be lifted if adequate funds are identified and made available to provide for these indigent defendants' constitutionally protected right to counsel.

## I. DISCUSSION

■ {2} A defendant is entitled to the assistance of counsel in criminal proceedings. U.S. Const. amends. VI, XIV; N.M. Const. art. II, § 14. The right to effective assistance of counsel is the right of the accused to put the prosecution's case to meaningful adversarial testing. *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The United States Supreme Court, after reflecting on the importance of attorneys to the adversary system, noted in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963):

The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

*Id.* at 344, 83 S.Ct. 792.

{3} New Mexico seeks to implement the constitutional right to effective assistance of counsel for indigent persons accused of committing a crime, as articulated in *Gideon*, by enactment of the Indigent Defense Act and the Public Defender Act. NMSA 1978, §§ 31–16–1 to –10 (1968) (Indigent Defense Act); NMSA 1978, §§ 31–15–1 to –12 (1973) (Public Defender Act). The legislature has not appropriated funds to the courts for the appointment of counsel to indigent defendants in criminal proceedings. *See State ex rel. Quintana v. Schnedar*, 115 N.M. 573, 577 n. 2, 855 P.2d 562, 566 n. 2 (1993). The legislature, however, has authorized the Chief Public Defender to expend public funds for the representation of indigent defendants accused of committing a crime. NMSA 1978, § 31–15–7(B)(15) (2001).

{4} In this case, defendants Robert Young and Reis Lopez have been charged with the first-degree murder of Ralph Garcia, in addition to other charges. The killing took place during the August 31, 1999 riot at the Guadalupe County Correctional Facility where Garcia was a corrections officer and defendants were inmates. The State is seeking the death penalty. Defendants previously sought dismissal of the aggravating circumstances supporting the death penalty. The district court denied their motion, and this Court affirmed the denial in an opinion issued on April 21, 2004. *State v. Young*, 2004–NMSC–015, ¶ 1, 135 N.M. 458, 90 P.3d 477.

{5} This case is again before this Court on an interlocutory appeal from the Fourth Judicial District Court. Defendants argue that

state funding of their defense has been inadequate and will lead to violation of their Sixth Amendment right to effective assistance of counsel. On April 14, 2003, defense counsel filed a motion asking to be compensated at an hourly rate, to be allowed to withdraw, and/or to dismiss the death penalty. Judge Allen denied the motion, although he noted in his order that defense counsel should receive fair compensation for their excellent representation of the defendants, and that the State's failure to pay fair compensation indicates that New Mexico cannot afford the death penalty. Judge Candelaria, after being reassigned the case, denied defendants' motion to reconsider. The district court certified the denial for interlocutory review when defense counsel stated that "they would be forced to accept a contempt citation rather than continue in their ... representation."

{6} All parties agree that this is one of the most complex death penalty cases ever tried in New Mexico. Indictments were filed in May 2000 and present counsel were appointed in June 2000. The State filed its notice of intent to seek the death penalty in November 2000. There are 15 named defendants, although the State seeks the death penalty against only three: Young, Lopez, and David Sanchez. Defendants' motion asserts that the State listed 128 witnesses and provided over 160,000 pages of discovery through various media.[1]

{7} Because of conflicts of interest, the Public Defender Department ("PD") was required to provide separate contract attorneys for all 15 defendants. The contracts call for counsel to provide representation for a flat fee. The original contracts provide a maximum of $19,500 through trial for each first-chair attorney and $9,500 for each second-chair attorney. These fees were increased several times over the course of five years, ultimately offering an additional $27,000 ($46,500 total) for each first-chair attorney and $12,500 ($23,000 total) for each second-chair attorney (hereinafter "offered contractual amendments"). Counsel have not signed the amendments offering the higher fees, and thus have received no payment beyond the initial contracts. The contracts have expiration dates, and have in fact expired, but the contracts require counsel to continue representation until the cases are concluded.

{8} Later appropriations by the legislature provided an additional $100,000 in attorneys' fees for each of the three death penalty defense teams, to be split between the first- and second-chair attorneys. The PD has conditioned payment of this additional money on new contracts, which defense counsel have refused to sign. The PD has also secured an additional $870,000 to fund the cases and has offered to use some of this $870,000 to pay attorneys' fees. All defense counsel agree, however, that this money should be used only to pay expert witnesses.

{9} Defense counsel estimate that they will be unable to cover their costs, even with the additional $100,000 allocation per team. The specific estimates of the time required to complete the case vary somewhat throughout the record. The most detailed analysis was provided by counsel for Lopez at the June 27, 2005 hearing on the motion to reconsider. Counsel estimated that both she and her co-counsel combined would spend a total of 2,334 hours from termination of the original contract on November 1, 2003, through the end of trial. If the contract amendments and additional $100,000 are applied just to the 2,334 hours, as counsel suggested, then the effective hourly rate would be somewhere between $43.84 and $60.20.[2] Counsel calculates the overhead rate for her office to be $73.96 per hour.

{10} Defense counsel may be the only participants in the trial who are not paid at an hourly rate. The videographer, who merely records witness interviews, receives $75.00 per hour, and has received "at least

---

1. The State believes that the discovery numbers 60,000 to 70,000 pages.

2. Defense counsel testified, based on an exhibit that the Court has been unable to obtain, that her hourly rate would be $43.84. Under a straight calculation, the contract amendments provide for ($46,500 + $23,000)-($19,500 + $9,500), or $40,500. With the additional allocation, the hourly rate is ($100,000 + $40,500) ÷ 2,334, or $60.20/hr.

three to four times the amount that the attorneys have been compensated."

{11} Young's counsel testified before the legislature in 1999, before he was involved in the defense, about the funding requirements for this case. He told the legislative committee that the defense would require at least $1 million per defendant. Counsel knew that the contract fell well below this amount, but believed the PD had agreed to provide reasonable compensation, although he did not believe that it would be close to $1 million. The PD did testify that the original contract provided for additional compensation if the amount defense counsel received was unfair.[3]

{12} After the PD's office learned of defense counsel's motion to withdraw, it attempted to locate alternative counsel. A "most exhaustive canvass" by the PD turned up only one attorney who was willing to take the case and who was not conflicted. During oral argument, the attorneys for the defendants represented that they could effectively represent their clients on first-degree murder charges with the $100,000 per defense team plus the contractual amendments offered by the PD. If the death penalty remained an option, however, an additional $100,000 per team, for a total of $200,000 per team plus the offered contractual amendments, would be essential to effectively represent the defendants during both the guilt phase and the sentencing phase of the proceedings.[4] We are persuaded by the evidence in the record that the attorneys for the defendants are not receiving adequate compensation. The inadequacy of compensation in this case makes it unlikely that any lawyer could provide effective assistance, and therefore, as instructed by the United States Supreme Court, ineffectiveness is properly presumed without inquiry into actual performance. *See Cronic*, 466 U.S. at 661, 104 S.Ct. 2039 (noting that there may be cases where "circumstances ma[k]e it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial.").

{13} In addition to the compelling evidence in this case, we are also mindful of the unique character of death penalty cases. "The death penalty 'is unique in its total irrevocability.... And it is unique ... in its absolute renunciation of all that is embodied in our concept of humanity.'" *State v. Martinez*, 2002–NMSC–008, ¶ 8, 132 N.M. 32, 43 P.3d 1042 (quoting *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring)). The gravity of the death penalty and grave injustice that would result from an erroneous carrying out of the death penalty have resulted in a heightened scrutiny of its imposition. *See id.* (citing *State v. Allen*, 2000–NMSC–002, ¶ 61, 128 N.M. 482, 994 P.2d 728 (1999); *Clark v. Tansy*, 118 N.M. 486, 490, 882 P.2d 527, 531 (1994)).

{14} As a general rule, the gravity of the death penalty and its requisite heightened scrutiny require a significantly greater degree of skill and experience on the part of defense counsel than is required in a noncapital case. *See* ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 1.1, History of Guideline (rev. ed.2003), *in* 31 Hofstra L.Rev. 913, 921 (2004) [hereinafter *ABA Guidelines*]. Capital defense teams must spend more time preparing for and trying a capital case than for non-capital cases. *See* State Bar of N.M., *Task Force to Study the Administration of the Death Penalty in New Mexico, Final Report* 6 (2003) [hereinafter *New Mexico Task Force Final Report*] (discussing a study of capital defense in federal courts and noting the "unique strains" placed on capital defense counsel, such as spending more time with a capital client, "unique and intensive training," and lengthy, complex jury selection). Therefore, it is indisputable that the prosecution and defense of capital murder cases are sub-

---

3. The Court is unable to locate such a clause in the contract.

4. This was the amount the attorneys for defendants and the PD agreed they would ask the legislature to fund to bring the cases to a conclu-

sion. The legislature responded by allocating only $100,000 per defense team rather than the $200,000 agreed to by the parties to the PD contracts.

stantially more expensive than in non-capital cases.

{15} Yet the financial burden on attorneys who contract to defend capital cases is not measured simply by the amount of time devoted to defending such cases. "[T]he demands of handling a death penalty case frequently preclude acceptance of other employment while the case is being litigated." *See id.* Unlike the public defenders employed by the PD, capital defense attorneys must pay overhead. Finally, because representation in capital cases requires specialized skills, intensive training relating to substantive areas of mitigation, forensic science, and practical instruction in advocacy skills is required.

{16} Because of the extraordinary demands on capital defense attorneys, *ABA Guidelines,* Guideline 8.1 Commentary, *in* 31 Hofstra L.Rev. at 979, the American Bar Association has condemned flat fees, caps on compensation, and lump-sum contracts in death penalty cases. *Id.,* Guideline 9.1(B)(1), *in* 31 Hofstra L.Rev. at 981. Rather than a flat fee or a capped rate, the *ABA Guidelines* stress that "[c]ounsel in death penalty cases should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the extraordinary responsibilities inherent in death penalty representation." *Id.,* Guideline 9.1(B), *in* 31 Hofstra L.Rev. at 981.

{17} The New Mexico Task Force reached a similar conclusion, stating that "Defense counsel in capital cases should receive . . . compensation[ ] commensurate with their expertise and the burden of the work and without caps. New Mexico should eliminate flat fee arrangements in capital cases." *New Mexico Task Force Final Report* at 10. The Task Force further noted that flat fees and caps are "an attempt to hide the true costs of capital litigation at the expense of contract counsel and, ultimately, his or her client." *Id.*

{18} Although we are not prepared to condemn a flat fee structure or cap in all capital cases, we cannot overemphasize that the case before us is unusually protracted because of its extraordinary complexity. We have found that the attorneys for the defen-

dants are not receiving adequate compensation, thus giving rise to a presumption of ineffective assistance of counsel. The questions remaining are (1) by what authority can we provide a remedy, and (2) what is the appropriate remedy.

## II. THE SUPREME COURT HAS IN-HERENT CONSTITUTIONAL AU-THORITY TO STAY THE DEATH PENALTY IN THIS CASE

{19} The New Mexico Constitution vests judicial power in the courts of this state. N.M. Const. art. VI, § 1. This power has been interpreted as granting courts the inherent power to exercise authority essential to their function and management of their caseloads. *State v. Gonzales,* 2002–NMCA–071, ¶¶ 21–22, 132 N.M. 420, 49 P.3d 681. An essential function of the courts is to "serve as the ultimate guardians of an indigent defendant's constitutional rights." *State v. Brown,* 2006–NMSC–023, ¶ 23, 139 N.M. 466, 134 P.3d 753. As guardians of the constitution, we must enforce the rights guaranteed by the constitution and further the intent of its provisions. *State ex rel. Udall v. Pub. Employees Ret. Bd.,* 120 N.M. 786, 793, 907 P.2d 190, 197 (1995).

{20} We have previously exercised our broad authority to enforce constitutional rights by ordering that indigent defendants represented by *pro bono* counsel are entitled to apply for and receive expert witness fees from the Public Defender Department. *Brown,* 2006–NMSC–023, ¶ 25, 139 N.M. 466, 134 P.3d 753. In *State ex rel. CYFD v. Kathleen D.C.,* 2007–NMSC–018, ¶ 16, 141 N.M. 535, 157 P.3d 714, we held that an indigent parent is entitled to the appointment of an expert witness at the State's expense in an abuse and neglect proceeding.

{21} Although we have not considered whether low compensation of attorneys in capital cases is unconstitutional, other states have addressed the subject, in both capital and non-capital cases, with varying remedies. Some courts have ordered additional compensation. *See, e.g., White v. Bd. of County Comm'rs of Pinellas County,* 537 So.2d 1376 (Fla.1989); *Makemson v. Martin County,*

491 So.2d 1109 (Fla.1986); *People ex rel. Conn v. Randolph,* 35 Ill.2d 24, 219 N.E.2d 337 (1966); *N.Y. County Lawyers' Ass'n v. State,* 196 Misc.2d 761, 763 N.Y.S.2d 397 (Sup.Ct.2003); *State v. Lynch,* 796 P.2d 1150 (Okla.1990); *Bailey v. State,* 309 S.C. 455, 424 S.E.2d 503 (1992). Others have threatened to dismiss the charges. *Lavallee v. Justices in Hampden Superior Court,* 442 Mass. 228, 812 N.E.2d 895 (2004); *State ex rel. Wolff v. Ruddy,* 617 S.W.2d 64 (Mo.1981). Yet others have stayed the prosecutions. *State v. Citizen,* 898 So.2d 325 (La.2005). Proactive steps may be necessary when the present compensation scheme "raises serious concerns about whether [the defendants] will ultimately receive the effective assistance of trial counsel." *Lavallee,* 812 N.E.2d at 904; *State ex rel. Partain v. Oakley,* 159 W.Va. 805, 227 S.E.2d 314, 323 (1976). Some of these courts applied their decisions only to their specific cases, while others set new state-wide standards. Common among these decisions, however, is the courts' exercise of inherent authority to ensure that indigent defendants receive constitutionally adequate assistance of counsel. *See, e.g., Citizen,* 898 So.2d at 336.

{22} In the present case, the defendants have suggested three remedies. First, defendants ask that counsel be allowed to withdraw. Although it was appropriate for these attorneys to seek permission to withdraw because the "representation will result in an unreasonable financial burden," the trial court could not grant permission because withdrawal would have "material adverse effect on the interests of the client." Rule 16–116(B)(5) NMRA. As noted, this case has been pending for several years, and the attorneys have interviewed dozens of witnesses and reviewed thousands of pages of documents. The prosecution itself has spent considerable resources on this case. It would be detrimental to the interests of the defendants and of the system of justice to permit the attorneys to withdraw, leaving it for new counsel to learn the details of this complex case from the beginning. Moreover, the evidence is undisputed that, despite good faith efforts, the PD has not been able to find substitute counsel.

{23} The second remedy urged by defendants is to require the PD to compensate counsel at a reasonable hourly rate. At present, the PD has funding to pay each defense team an additional $100,000 plus the offered contractual amendments. This amount remains inadequate. Defense counsel represented to this Court that an additional $200,000 per defense team, in addition to the $870,000 in costs and offered contractual amendments, would suffice to reasonably compensate defense counsel through the conclusion of these capital cases. The legislature, for reasons that are unknown, declined to appropriate $200,000 per defense team. It may very well be that the legislature decided to appropriate $100,000 without prejudice to the PD's right to seek an additional $100,000 as the case approached a conclusion. Nevertheless, in our judgment, the amount requested by defendants will avert a constitutional challenge to the effectiveness of their counsel based on inadequacy of resources.

{24} We acknowledge the importance of the legislature's role in this case. The legislature appropriated $100,000 per defense team for these cases in 2005. While this is an important first step, the two defense teams before us have represented, without contradiction, that they require an additional $200,000, or $100,000 per team, payable at $75.00 per hour, to adequately represent their clients through the end of these cases if they are tried as death penalty cases. As a result, we conclude that this additional money is essential to protect defendants' constitutional right to effective assistance of counsel so long as the State continues to pursue the death penalty. Based on the current funding scheme, this $200,000 must come from legislative appropriations. Although defendants have asked that we dismiss the death penalty in this case, we believe the more prudent course is to stay the death penalty, affording the PD an opportunity to pursue supplemental funding. Therefore, unless and until such amount is made available by the PD, pursuit of the death penalty against defendants Young and Lopez by the State is stayed.

{25} We acknowledge that staying the death penalty, rather than dismissing it, may

affect defendants' right to a speedy trial if the death penalty is reinstated after a delay in appropriating the additional funds. Determination of when the delay will become prejudicial is necessarily imprecise and " 'dependent upon the peculiar circumstances of the case.' " *State v. Coffin,* 1999–NMSC–038, ¶ 56, 128 N.M. 192, 991 P.2d 477 (quoting *Barker v. Wingo,* 407 U.S. 514, 530–31, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)); *see also State v. Manzanares,* 1996–NMSC–028, ¶ 8, 121 N.M. 798, 918 P.2d 714 (defining the balancing test for evaluating speedy-trial claims). This is a question best left initially to the trial court. *Coffin,* 1999–NMSC–038, ¶ 56, 128 N.M. 192, 991 P.2d 477 (citing *Manzanares,* 1996–NMSC–028, ¶ 9, 121 N.M. 798, 918 P.2d 714).

{26} If the State is able to obtain the requisite funding as outlined herein, each defense team will be paid at a rate of $75.00 per hour per attorney, not to exceed $200,000 per team, plus the previously offered contractual amendments of $27,000 for each first-chair attorney and $12,500 for each second-chair attorney. Should the State be unable to obtain the requisite funding as outlined herein, then each defense team will be paid at the same rate, not to exceed $100,000 plus the offered contractual amendments. We note that defense counsel has conceded that this amount will be sufficient to reasonably compensate them for the defense of all pending charges, provided the death penalty is no longer available. To receive payment, counsel must submit time sheets or invoices to the Public Defender Department to support the number of hours reasonably spent on the defense. Because counsel have not received payment since termination of the original contract on November 1, 2003, counsel may submit requests for payment retroactive to that date.

## III. CONCLUSION

{27} Defense counsels' compensation is inadequate under the facts of this case, violating defendants' Sixth Amendment right to effective assistance of counsel. Prosecution of the death penalty is stayed unless the State makes adequate funds available for the defense. We have set the hourly rate and maximum compensation based on the unique circumstances of this case. In doing so, we make no determination that similar fees or rates are constitutionally required in other cases.

{28} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, RICHARD C. BOSSON, Justices, and RICHARD E. RANSOM (Pro Tem).