87 A.3d 809

**COMMONWEALTH of Pennsylvania, Respondent**

**v.**

**Shirvin McGARRELL, Petitioner.**

**Commonwealth of Pennsylvania, Respondent**

**v.**

**Darryl Young, Petitioner.**

**Commonwealth of Pennsylvania, Respondent**

**v.**

**Herman Burton, Petitioner.**

**Nos. 77 EM 2011, 78 EM 2011, 79 EM 2011.**

Supreme Court of Pennsylvania.

March 21, 2014.

## *ORDER*

PER CURIAM.

**AND NOW**, this 21st day of March, 2014, the Motion for Leave to File a Reply, filed August 17, 2011, is **DISMISSED**, the "Application for Leave to File Response the Pennsylvania Supreme Court Order of 12/12/2012 [sic]" is **DENIED AS MOOT**, and the Motion for Leave to File a Reply, filed September 23, 2013, is **GRANTED**.

Upon consideration of the Updated Report and Recommendations of the Special Master, the Honorable Benjamin Lerner, and the responses of the parties, the "Petition for Extraordinary Relief and/or Issuance of a Writ of Mandamus" is **DISMISSED**. The Court accepts the Updated Report and Recommendations, and thanks Judge Lerner for his exemplary efforts and analysis. At this juncture, the continued oversight of this Court is no longer required.

Jurisdiction relinquished.

Justice SAYLOR files a Dissenting Statement, in which Justices TODD and McCAFFERY join.

Justice McCAFFERY files a Dissenting Statement, in which Justice TODD joins.

Justice SAYLOR, dissenting.

During my tenure on the Court I have been dismayed by the deficient performance of defense counsel in numerous Pennsylvania death-penalty cases. Recently, I collected some observations in my special concurrence in *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 633–38 (2012) (Saylor, J., concurring specially), including a sampling of instances of substandard lawyering and remarks about the present litigation, which I incorporate by reference here.

Significantly, Pennsylvania has long been on notice that leaders of national, state, and local bar associations do not believe that capital litigation is being conducted fairly and evenhandedly in the Commonwealth, not the least because of

the *ad hoc* fashion by which indigent defense services are funded from the local government level.[1] Such concerns are consistent with vast compilations of literature containing evidence of long-standing, chronic underfunding of public defense systems in the United States. *See generally* Nat'l Right to Counsel Comm., *Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel,* CONST. PROJECT 2–3 (2009).[2] Nevertheless, this Court seems unable to attend to the apparent systemic difficulties in individual capital cases considered on appeal, as, doctrinally, the adjudicatory focus is on the facts at hand relative to an array of widely disparate claims of deficient stewardship.

Thus, the present litigation offers an essential opportunity for this Court to address a systemic challenge amidst much evidence that Pennsylvania's capital punishment regime is in disrepair. *See King,* 57 A.3d 607, 633–38 (Saylor, J., concurring specially). While the local government in Philadelphia has undertaken to implement some modest reform measures relative to legal-services funding in the death-penalty arena, Petitioners reasonably question the adequacy of such changes, while pointing to other jurisdictions in which the courts have assumed a more active role. *See, e.g., State v. Young,* 143 N.M. 1, 172 P.3d 138, 140 (2007) (collecting cases from courts

---

1. *See, e.g.,* ABA, *Evaluating Fairness and Accuracy In State Death Penalty Systems: The Pennsylvania Death Penalty Assessment Report* iii (Oct.2007) ("The Pennsylvania Death Penalty Assessment Team has identified a number of areas in which Pennsylvania's death penalty system falters in affording each capital defendant fair and accurate procedures," including in the failure to protect against poor defense lawyering[.]").

2. Petitioners also cite evidence suggesting there is large disparity in terms of disposition results obtained on behalf of homicide defendants whose legal interests are advanced by the salaried attorneys of the Defender Association of Philadelphia and those represented by court-appointed lawyers subject to modified flat-fee arrangements. *See* James M. Anderson & Paul Heaton, *How Much Difference Does the Lawyer Make? The Effect of Defense Counsel on Murder Case Outcomes,* 122 YALE L.J. 154, 159–60 (2012). Notably, the statistically better outcomes are attained by the Defender Association, which, in capital litigation, adheres to the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *Reprinted in* 31 HOFSTRA L.REV. 913 (2003).

exercising "inherent authority to ensure that indigent defendants receive constitutionally adequate assistance of counsel.").

In summary, I believe that Petitioners' challenge to the funding of legal services for indigent capital defendants in the First Judicial District presents an opportune vehicle for deeper, developed review and explication by this Court about fundamental fairness in the highest-stakes criminal prosecutions. Ideally, the Court's further consideration might also serve as a springboard to a collaborative conversation among the judicial, legislative, and executive branches to institutionalize statewide remedies and facilitate ongoing improvements.[3]

In light of the above, I am unable to support either the majority's decision to dismiss the petition summarily or its pronouncement that "the continued oversight of this Court is no longer required."

Justices TODD and McCAFFERY join this dissenting statement.

Justice McCAFFERY, dissenting.

I join Justice Saylor's dissenting statement and write separately to explain why, in my view, the continued oversight of this Court is necessary with respect to the reform measures undertaken to remedy Philadelphia's heretofore chronic underfunding for legal services for indigent capital defendants, and particularly to express my disagreement with the "flat fee" manner in which attorneys representing indigent capital defendants continue to be remunerated. Although the five-

---

**3.** The importance of legislative involvement cannot be overstated. State-level funding for indigent defense services—presently lacking in Pennsylvania and only one other state in the nation—is at the core of nearly every reform recommendation. *See, e.g.,* Nat'l Right to Counsel Comm., *Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel,* CONST. PROJECT 11–12, 54. While certainly, governments are currently operating under financial pressures, the Legislature has made the decision to authorize capital punishment in the Commonwealth. Accordingly, it and subordinate instrumentalities must ensure adequate funding to meet all attendant constitutional mandates, including the requirement for the Commonwealth to provide effective attorney stewardship for indigent defendants.

fold increase in the flat fee paid to guilt phase and penalty phase counsel under the new remuneration template for the FJD has resulted in greater numbers of qualified attorneys being on the appointment list, in my view, the majority fails to heed Judge Benjamin Lerner's clear and substantial preference for an hourly rate.[1]

As Judge Lerner noted in his Recommendation and Report, although the "average" Philadelphia capital case requires one hundred twenty-five (125) attorney work hours, the potential complexities that may arise in litigating a capital case frequently require enlarging the number of hours counsel must devote to any given case above that of an "average" case, and thus, a one-size-fits-all flat fee is less than ideal. In my view, an hourly rate as suggested by Judge Lerner would be a fairer method of remuneration, and would have the added benefit of providing a greater measure of accountability because there would be an itemized bill from counsel for hours worked and tasks performed. Such itemization is more amenable to review and verification than a simple presentation of the request for issuance of the flat fee "earned" for an appointment, plus trial day *per diems*. I would defer to Judge Lerner's wisdom on this point, and set an hourly rate.

Moreover, although the reforms instituted thus far have had the salutary intended effect of improving somewhat the system for providing legal services to indigent capital defendants, the work is certainly not done; thus, I disagree with the majority's determination that the oversight of this Court is no longer required. It is not as if Judge Lerner's Updated Report and Recommendations, issued July 10, 2013, showed that all the problems flowing from the capital defense crisis in Philadelphia have been finally and permanently rectified, or even

1. Judge Lerner, the former Chief Defender for Philadelphia who later served as the calendar judge for all homicide prosecutions in Philadelphia, was the jurist presiding over Petitioners' cases at the time the initial petition in this matter was filed. We appointed this able jurist as Special Master in these proceedings because we believed the benefits of his input would be immeasurable. In his Recommendation and Report issued February 21, 2012, Judge Lerner suggested his strong preference that appointed capital counsel be remunerated at an hourly rate of $90.00.

that the trajectory of the program reforms going forward is certain. To the contrary, Judge Lerner warned, in his conclusions, that "the improvements . . . are not self-sustaining, and they do not indicate that we can rest on our laurels." Report, 7/10/13 at 9. Indeed, Judge Lerner noted that while the capital appointment list, which stands now at thirty-three (33) qualified attorneys is sufficient, it is "far from ideal," and he pointed out the constant need to increase the number of qualified attorneys on the list due to normal career changes, the aging process and other attrition factors. *Id.* at 9–10. Judge Lerner also expressed his view that under either an hourly rate or flat-fee system, it is likely that a fee increase will soon be required in order to continue to provide an incentive for qualified attorneys to accept capital appointments.

Finally, I would note that Philadelphia is a big city with historically high annual homicide rates requiring a correspondingly large, fair and efficient capital justice system. While the changes instituted thus far have promoted better management of the capital dockets, in my view, the continued oversight of this Court is necessary simply due to the number of murders in Philadelphia, the size of the system designed to adjudicate those crimes, and the chronic underfunding that has debilitated the system to date. The system may at some time become fixed and self-sustaining. In my view, that time has not yet arrived. Accordingly, I respectfully dissent, and would not summarily dismiss the petition or discontinue the oversight of this Court.

Justice TODD joins.