146 A.3d 715

Adam KUREN and Steven Allabaugh, on Behalf of Themselves and All Others Similarly Situated, Appellants

v.

LUZERNE COUNTY of the Commonwealth of Pennsylvania and Robert C. Lawton, County Manager, in His Official Capacity, Appellees

Adam Kuren and Steven Allabaugh, on Behalf of Themselves and All Others Similarly Situated, Appellants

v.

Luzerne County of the Commonwealth of Pennsylvania and Robert C. Lawton, County Manager, in His Official Capacity, Appellees

No. 57 MAP 2015
No. 58 MAP 2015

Supreme Court of Pennsylvania.

ARGUED: April 6, 2016

DECIDED: September 28, 2016

34

36

Marrisa Boyers Bluestine, Esq., Temple University School of Law, Terence Martin Grugan, Esq., Ballard Spahr, LLP, for The Innocence Network & The PA Innocence Project, Amicus Curiae.

Paulette Brown, Esq., Edward W. Madeira Jr., Esq., Eli Mordecai Segal, Esq., Pepper Hamilton LLP, for American Bar Association, Amicus Curiae.

Arleigh Pritchard Helfer III, Esq., Paul H. Titus, Esq., Schnader Harrison Segal & Lewis, LLP, for National Assoc. of Criminal Defense Lawyers & PA Assoc. of Criminal Defense Lawyers, Amicus Curiae.

Nathaniel Pollock, Esq., for United States, Department of Justice, Civil Rights Division, Washington, DC, Amicus Curiae.

Kimberly D. Borland, Esq., Borland & Borland, L.L.P., Vermon L. Francis, Esq., Sean Patrick McConnell, Esq., Katherine Elizabeth Unger, Esq., Michelle Hart Yeary, Esq., Dechert, LLP, Dina L. Hardy, Esq., Hangley Aronchick Segal Pudlin & Schiller, Mary Catherine Roper, Esq., David Rudovsky, Esq., Kairys, Rudovski, Messing & Feinberg, Martha Meredith Tack–Hooper, Esq., ACLU of Pennsylvania, Witold J. Walczak, Esq., American Civil Liberties Union of PA, for Adam Kuren, Steven Allabaugh, and all others similarly situated, Appellant.

James C. Crumlish III, Esq., Deborah Hart Simon, Esq., Elliott Greenleaf & Siedzikowski, P.C., John G. Dean, Esq., for Luzerne County and Robert C. Lawton, Appellees.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.

## OPINION

JUSTICE WECHT

The Sixth Amendment to the United States Constitution safeguards some of our basic liberties. Among its protections is the guarantee that, "[i]n all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence." U.S. Const., Amend VI. In the seminal case of Gideon v. Wainwright, the United States Supreme Court held that this bedrock right extended to state courts by application of the Due Process Clause of the Fourteenth Amendment. 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Since Gideon, the Sixth Amendment has required not only federal courts but state courts as well to provide counsel to all those who are criminally accused but who cannot afford to pay for an attorney.

The Public Defender Act, 16 P.S. § 9960.3, requires each Pennsylvania county to maintain a public defender's office charged with fulfilling Gideon's dictates. These offices are chronically underfunded and understaffed, and are hard-pressed to meet the baseline demands of the Sixth Amend-

ment, raising the disconcerting question of whether counties are complying with Gideon. In this case, the trial court stated that "[t]o describe the state of affairs in the Office of the Public Defender as approaching crisis stage is not an exaggeration." Trial Court Opinion, 6/15/2012, at 16.

The question that we confront today is whether a cause of action exists entitling a class of indigent criminal defendants to allege prospective, systemic violations of the right to counsel due to underfunding, and to seek and obtain an injunction forcing a county to provide adequate funding to a public defender's office. Pursuant to Gideon and its progeny, and because remedies for Sixth Amendment violations need not await conviction and sentencing, we hold that such a cause of action exists, so long as the class action plaintiffs demonstrate "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." O'Shea v. Littleton, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

## I. Background [1]

In May 2010, the Luzerne County Board of Commissioners appointed Al Flora, Jr., Esq., an attorney who served in the Luzerne County Office of Public Defender ("OPD") for approximately thirty years, to be Chief Public Defender. When Flora assumed the Chief's position, the OPD already was riddled with problems stemming from understaffing and underfunding, deficiencies most prominently displayed at the time by the OPD's inability to represent juveniles facing delinquency petitions. A report prepared in the aftermath of

1. As set forth in more detail below, the class action lawsuit at issue in this case was dismissed at the preliminary objection stage. Our standard of review is well-settled. "Upon review of a decision sustaining or overruling preliminary objections, 'we accept as true all well-pleaded material facts set forth in the [petition for review] and all inferences fairly deducible from those facts.'" Robinson Twp. v. Commonwealth, 623 Pa. 564, 83 A.3d 901, 917 (2013) (quoting Thierfelder v. Wolfert, 617 Pa. 295, 52 A.3d 1251, 1253 (2012)). "We will affirm an order sustaining preliminary objections only if it is clear that the party filing the petition for review is not entitled to relief as a matter of law." Id. (citation omitted). Thus, the factual and procedural history of this case is derived from the amended complaint. For purposes of this appeal, we accept, as we must, these histories as true.

the notorious "Kids for Cash"[2] scandal detailed the OPD's abject inability to represent accused juveniles, noting that approximately fifty percent of juveniles appearing in Luzerne County's Juvenile Court were unrepresented. Eventually, Flora was able to secure funding to create a Juvenile Unit within the OPD in order to reduce the office's deficiencies in representing juveniles. However, in order to staff this new unit, Flora had to transfer a senior attorney out of the OPD's Adult Unit. Although funding existed to replace the senior attorney in the Adult Unit, Luzerne County officials rebuffed Flora's request for authorization to fill the position, thus leaving the Adult Unit understaffed to tackle its increasing caseload.

In June 2010, Flora submitted a report to the Luzerne County Board of Commissioners regarding the state of the OPD. In the report, Flora outlined his belief that, for want of sufficient resources and funding, the OPD could not provide adequate representation to Luzerne County's indigent criminal defendants in a manner sufficient to satisfy the Public Defender Act, the Sixth Amendment to the United States Constitution, or Article I, Section 9 of the Pennsylvania Constitution.[3] In his report, Flora noted that the lack of resources created rampant deficiencies in representation, including the following:

1. Caseloads for OPD attorneys exceeding national standards;

2. Insufficient support staff;

3. Insufficient number of attorneys due to Luzerne County's refusal to authorize hiring;

4. Lack of appellate attorneys, requiring trial attorneys untrained in appellate practice to litigate appeals;

5. Facilities unsuitable for confidential meetings with indigent defendants; and

---

2. See Stephanie Chen, "Pennsylvania rocked by jailing kids for cash scandal", CNN, http://www.cnn.com/2009/CRIME/02/23/pennsylvania.corrupt.judges/ (Feb. 24, 2009) (last visited on June 6, 2016).

3. Article I, Section 9 of the Pennsylvania Constitution provides that "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel . . . ." Pa. Const., Art. I, § 9.

6. Inadequate information technology.

Amended Complaint, 5/15/2013, at 12 ¶ 29. Flora informed the Commissioners that, without additional attorneys and support staff, "the [OPD] will begin declining applications for representation within 60 days." Id. ¶ 30.

In July 2010, Flora provided the Luzerne County Board of Commissioners with a short-term plan to address the deficiencies. The plan included recommendations to hire new appellate attorneys as well as additional trial attorneys, and to create and implement a caseload-monitoring system. The Board of Commissioners denied each recommendation. Then, in his 2011 and 2012 budget proposals, Flora sought the addition of two appellate attorneys, an investigator, and a secretary. On each occasion, the Board of Commissioners rejected Flora's requests.

In December 2011, Flora decided to implement his 2010 proposal to decline representation to certain applicants. Faced with mounting caseloads and overwhelmed attorneys, Flora directed the OPD to reject applicants who were not incarcerated and who were charged only with minor offenses. The OPD continued to refuse representation to such individuals until June 2012.

In January 2012, despite Flora's ongoing requests, Luzerne County decreased the OPD's funding by approximately 12%. The reduction would have required the OPD to eliminate four full-time positions from its already-strained staff. Flora was able to reallocate funds to retain those positions, but doing so significantly limited the OPD's ability to retain experts in some matters, including capital cases and complex juvenile proceedings.

In early 2012, a number of attorneys resigned from the OPD. Because Luzerne County implemented a hiring freeze in February of that year, Flora could not fill the positions. By April, the OPD staff consisted of only four full-time attorneys, thirteen part-time attorneys, three investigators, four secretaries, one receptionist, and one office administrator. The OPD continued to operate with five unfilled attorney positions,

three full-time and two part-time. Most of the attorneys who worked for the OPD did not have their own desks, telephones, or computers. One part-time attorney informed Flora that he could not accept any more cases because, due to his current caseload, he could not satisfy his ethical duties to any additional defendants.

The cases continued to amass. Yet, despite Flora's efforts, no additional funding was forthcoming, and none appeared likely. Faced with no other option, and believing that the attorneys working for the OPD could not meet their ethical and professional obligations, Flora turned to the courts for relief.

On April 10, 2012, Flora, in his capacity as Chief Public Defender, along with plaintiffs Samantha Volciak, Yolanda Holman, Charles Hammonds (collectively, the "plaintiffs" or "original plaintiffs"), and on behalf of unnamed but similarly situated individuals, filed a class action lawsuit against Luzerne County and Robert Lawton, its County Manager (collectively, "Appellees"). Other than Flora, the plaintiffs identified themselves as persons charged with crimes in Luzerne County, each of whom qualified for the OPD's services. The OPD could not provide these plaintiffs with representation due to the inadequate funding and depleted resources plaguing the office. Flora and the other plaintiffs sought a writ of mandamus compelling the county to lift the hiring freeze and to increase funding to the OPD to a level that would enable the OPD to provide adequate representation to every qualified applicant. Simultaneously, the plaintiffs brought a claim under the federal Civil Rights Act, see 42 U.S.C. § 1983, and Article I, Section 9 of the Pennsylvania Constitution, seeking an injunction against Appellees requiring the immediate appointment of private counsel to assist them in their defenses and requiring additional funding to satisfy the OPD's obligation to ensure that all qualified applicants receive competent legal representation.

Two days later, on April 12, 2012, Flora and the original plaintiffs filed a motion for a peremptory writ of mandamus and a preliminary injunction, along with a brief in support of

the motions. On April 30, 2012, Appellees filed preliminary objections to the complaint, including, *inter alia,* an objection to the trial court's jurisdiction, an objection to the standing of each plaintiff to sue, and a demurrer, alleging that Flora and the other plaintiffs had failed to state a claim upon which relief could be granted. On May 10, 2012, following additional briefing and supplementation, the trial court convened a hearing to allow the parties to present oral argument on the motion for a peremptory writ of mandamus and a preliminary injunction.

On May 16, 2012, the trial court appointed a Master to preside over settlement negotiations. On May 24, 2012, the trial court overruled each of Appellees' preliminary objections after determining that the objections lacked merit. The court directed Appellees to file an answer to the class action complaint within thirty-five days.

Shortly thereafter, on June 15, 2012, the trial court found that Flora and the original plaintiffs were entitled to both a peremptory writ of mandamus and a preliminary injunction, and entered a corresponding order to remain in force until the class action suit was resolved. The order mandated the following actions:

(a) [Appellees] shall not prevent the public defender from filling vacant funded positions;

(b) [Appellees] shall review the operations and staffing of the [OPD] and provide a plan to meet the constitutional obligations for indigent representation in accordance with the principles set forth in [a corresponding opinion by the court];

(c) [Appellees] shall submit a report to [the trial court] within a reasonable time outlining [their] plan to meet [their] constitutional obligations in regard to the operation, staffing and expenses of the [OPD];

(d) [County Manager Lawton] is directed to provide adequate office space in order to permit confidential communications between assistant public defenders and indigent criminal defendants within 30 days of the date of this order; and

(e) [Flora and the OPD are] <u>not</u> permitted to refuse representation to qualified indigent criminal defendants.

Order, 6/15/2012 (emphasis in original). With regard to the individual plaintiffs, the trial court ordered Appellees to allocate the funding necessary to ensure that each such plaintiff received court-appointed, private counsel for the duration of his or her criminal proceedings. <u>Id.</u>

On June 28, 2012, Appellees answered the complaint. On January 29, 2013, Appellees filed a petition for a pre-trial conference. In that petition, Appellees explained that, at the time of the trial court's June 15, 2012 order, they already had commenced meeting with the District Attorney's office to discuss and initiate a plan to ensure that every indigent defendant in Luzerne County is provided with representation. Additionally, Appellees detailed the following actions that they took after the trial court's mandate:

(a) Facilities:

- On July 13, 2012, the County's engineer met with Chief PD Flora to review facilities in Penn Place and provided Chief PD Flora with keys to two conference rooms to use to conduct confidential meetings.

 Result:

- OPD now has space where it can conduct confidential meetings with clients that is convenient to its offices.
- In January 2013, the County began moving the Register of Wills Office out of its space in Penn Place in order to expand OPD's offices.

\* \* \*

- The County has complied with the Court's Order regarding OPD's immediate needs and has taken concrete steps toward expanding and improving the facilities available to the OPD.

(b) Backlog:

- In a period of approximately 30 days, the County's counsel met with the District Attorney and worked on a framework for disposing of the cases in the backlog and thereafter with the assistance of the Court Administra-

tor and Conflict Counsel, approximately 500 indigent [defendants] secured representation and disposition of their cases.

(c) Staffing:

- The County authorized and approved the posting and advertising for the 5 attorney opening positions.
- The County agreed that Attorney Flora could convert the openings that were previously held by part time attorneys to full time positions (because the salaries of the departing part timers were sufficient to cover entry level full time attorneys).
- The County waived the application of the newly adopted Personnel Code to the filling of attorney vacancies in OPD.
- The County's Human Resource Director assisted Attorney Flora in evaluating and ranking the candidates.
- The County authorized OPD to hire an expert in providing training for Public Defender Offices to conduct an in-house training for OPD's newly hired Assistant Public Defenders.

Petition for Pre-trial Conference, 1/29/2013, at 3-4 ¶ 7. Appellees further alleged that the court-ordered mediation sessions were failing, in large part due to unwillingness on the part of Flora and the plaintiffs to make any concessions. Appellees believed that the mediation process had "run its course" and evolved into a "forum for Plaintiffs to raise petty grievances and to avoid working cooperatively with the established mechanisms and realities of the County's governmental system." Id. at 4, ¶ 13. Appellees asserted that the most prudent course of action was to begin the process of preparing for trial. Flora and the original plaintiffs rejected the view that they were not negotiating in good faith, and consented to a pre-trial conference and to setting the case on a path for trial.

Following a March 26, 2013 pre-trial conference, the court scheduled trial for June 24, 2013. However, on April 25, 2013, Flora and the plaintiffs filed a praecipe to remove Volciak and Holman from the case, wherein they noted that both of these

individuals sought to discontinue their claims voluntarily and without prejudice. The praecipe further stated that plaintiffs believed that Hammonds also would voluntarily discontinue his claim, but that, at the time of the praecipe, Hammonds had been transferred to the Allegheny County Jail and had not yet formally consented to the discontinuation. Because of the efforts undertaken by Appellees as described above, each of these plaintiffs had been provided with a criminal defense lawyer and no longer suffered from the deprivation of counsel that was alleged in the complaint.

After the pretrial conference, Lawton designated Steven M. Greenwald to serve as Chief Public Defender. Flora was formally terminated on April 17, 2013. The Luzerne County Board of Commissioners confirmed Greenwald on April 29, 2013. In light of these events, Flora and Hammonds, who still had not been removed as plaintiffs, filed a motion to amend their class action complaint on May 1, 2013. Over the objection of Appellees, the trial court granted the motion to amend the complaint, without prejudice to Appellees' right to file preliminary objections to the amended complaint.

On May 15, 2013, Flora and Hammonds filed an amended complaint naming Joshua Lozano, Adam Kuren, and Steven Allabaugh (hereinafter "Appellants") as replacement plaintiffs for Volciak and Holman. Each of these three individuals was indigent and facing criminal charges in Luzerne County, and each had been assigned an attorney by the OPD. However, Appellants alleged that, due to the financial straits of the OPD, and the limited time and resources that the OPD's attorneys could devote to each case, the representation that Appellants would receive as their cases progressed would not meet constitutional norms.

By the time that the amended complaint was filed, Flora had implemented several measures to mitigate the costs associated with operating the OPD, and had continually sought assistance from potential funding sources. For instance, Flora applied for grants and reallocated funds to purchase computers for OPD lawyers. Flora also began sending OPD attorneys to initial bail hearings in an effort to decrease the amount of

time that defendants spent in jail, an initiative which saved Luzerne County money that could have been allocated to the OPD, but was not. Flora then worked with the OPD attorneys to shift the workload from busier lawyers to those with a lighter caseload to ensure that defendants were receiving the best representation possible. As noted above, however, Flora was fired as Chief Public Defender nonetheless.

Flora's attempts to reduce the burden on the OPD did not substantially alleviate the growing crisis. Caseloads continued to mount, but no increase in funding was in the offing. When the amended complaint was filed, the OPD employed ten full-time attorneys, eleven part-time attorneys, three investigators, four secretaries, one receptionist and one office administrator. Two of the full-time positions were funded only until early 2014, when they would revert to part-time positions.

In the amended complaint, Appellants detailed the effects that the inadequate funding had upon the OPD's ability to meet its constitutional mandate. Appellants first delineated six essential components of competent "legal representation" that offices servicing indigent defendants require in order to comply with the Sixth Amendment: (1) the attorneys must have adequate knowledge of the relevant areas of the law; (2) the attorneys must be assigned to represent indigent clients at the earliest possible stage; (3) the attorneys must be present at every critical stage of the client's case; (4) the office and attorneys must be able to conduct reasonable factual and legal pre-trial investigations, pursue and comply with the discovery rules, and utilize investigators when necessary; (5) the attorneys must be able to consult with their clients to discuss the material aspects of the case, as well as the client's substantive and procedural rights, to ensure that the client is making informed decisions regarding the case; and (6) the attorneys must be able to perform their work with reasonable diligence and promptness. These criteria, according to Appellants, comprised the necessary elements of constitutional representation of indigent defendants. Due to the lack of funds and resources, Appellants alleged that the OPD could not satisfy any one of

these six criteria, let alone all of them, and, therefore, could not provide constitutionally adequate representation.

Regarding the first component, adequate knowledge of the relevant law, Appellants pleaded that the OPD could not sufficiently train its attorneys in the Adult Unit because there simply were no funds to do so. Those attorneys who were tasked with capital cases were required to pay out of their own pocket for the continuing legal education required for capital-qualified attorneys. Moreover, even though the OPD recently had hired one appellate attorney, many of the trial attorneys nonetheless had to brief, file, and argue the appeals that arose from their trial dockets. Because the OPD lacked the time and resources for appellate training, these trial attorneys were underqualified to perform appellate litigation, often proceeding without proficiency in the rules of appellate procedure and governing case law. As a result, the attorneys often missed deadlines or otherwise failed to comply with the technical requirements of an appeal. The time required to pursue appeals also critically reduced the OPD attorneys' time to consult with clients and prepare for trials.

As to the criterion of early assignment to clients, Appellants averred that the ongoing constraints upon the OPD prevented the assignment of attorneys to assist clients at initial arraignments. This stage, Appellants pointed out, is a critical one, at which the right to counsel attaches. See Amended Complaint, 5/15/2013, at 19 (citing Rothgery v. Gillespie County, 554 U.S. 191, 213, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008)).

With regard to the third criterion, Appellants maintained that the OPD could not furnish counsel at all critical stages of the clients' proceedings. Appellants asserted that the heavy caseload and inadequate resources and manpower prevented the OPD attorneys from best serving their clients' interests at the pre-trial stages. Due to the heavy caseload, OPD attorneys frequently had to postpone hearings, which delayed cases and often forced indigent clients to spend more time in jail than they would have had counsel been more available. Additionally, their overwhelming caseloads denied OPD attorneys the time necessary to consult adequately and fully with clients

before those individuals had to make critical, life-altering decisions. The clients were forced to make these decisions without a full understanding of the facts of their cases, the elements of their crimes, or the potential defenses available to them. Finally, the caseloads created trial schedules that prohibited consistent representation; often, substitute attorneys filled in for unavailable attorneys while lacking critical information about the clients or the cases.

Next, Appellants asserted that the OPD attorneys were unable to conduct reasonable factual investigations and discovery. Time constraints often prevented any investigation. Even when an attorney obtained discovery materials, he or she rarely had any time to review the materials rigorously. Attorneys frequently entered into plea negotiations on behalf of their clients without a full understanding of the cases.

The attorneys themselves lacked the time or resources to interview witnesses, visit crime scenes, or otherwise investigate the facts alleged by the Commonwealth. The OPD also lacked the investigators necessary to perform these critical functions. At the time of the amended complaint, the OPD employed three investigators to service twenty-one attorneys and the 4000 new cases that come to the OPD every year. By way of comparison, the Luzerne County District Attorney's Office employed ten detectives, who assisted twenty-six attorneys. OPD investigators often could not perform investigative duties during the work day because they were required to perform administrative duties, such as entering information into a case management system or delivering mail, due to the lack of support staff.

Regarding the fifth component, consultation with clients, Appellants averred that OPD attorneys lacked the resources to conduct in-person visits at the jail, and had to consult with incarcerated clients via video conferences, which are not confidential. Moreover, many clients met their attorney for the first time immediately before their preliminary hearing, and without any meaningful, confidential discussion about the case or the nature of the hearing itself. After the preliminary hearing, OPD attorneys rarely contacted their clients in the approxi-

mately three months between the hearing and the status conference, or between the status conference and the pre-trial conference. Clients were left in the dark during these critical months. Similarly, Appellants maintained that the OPD attorneys were not available for substantive meetings with clients before either trial or sentencing. Stated differently, the OPD attorneys were not able to maintain regular or sustained contact with their clients, which substantially hindered the attorney-client relationship and compromised the ability to present an effective defense or to negotiate favorable plea agreements.

As to the final component, Appellants pleaded that the OPD attorneys were unable to perform their work with reasonable diligence and promptness. Motions were not filed on time, and were rarely accompanied by a full review of discovery materials. Plea negotiations similarly were uninformed. Trial preparation was hasty, and often came too late to uncover the facts necessary to mount an effective defense.

Appellants detailed the workload required of each OPD attorney. In 2010 and 2011, the OPD received over 4,000 new criminal cases, 2,000 of which were felonies. There were also over 1,000 carry-over cases from prior years. In addition, the OPD processed appeals, mental health commitment proceedings, and parole hearings. Each case requires out-of-court preparation, consultation, investigation, and, in some instances, travel. This caseload had to be managed by twenty-one attorneys, a majority of whom were part-time employees.

Appellants next addressed the other problems that plagued the OPD due to underfunding. The OPD was unable to employ enough social workers, paralegals, assistants, clerical workers, or other necessary support staff. Many attorneys lacked desks, phones, or private workspaces. The circumstances improved after the County took efforts to comply with the trial court's order granting the preliminary injunction, including providing spaces for confidential communications. Nonetheless, facilities necessary to operate a constitutionally adequate office were not provided.

Based upon these averments, Appellants raised three counts in their amended complaint. In count I, Appellants sought a writ of mandamus compelling Luzerne County to provide sufficient funding to enable the OPD to satisfy its constitutional mandate. Supporting this count, Appellants specifically averred that the OPD attorneys frequently were:

 a. unable to interview or meet with clients prior to preliminary hearings;

 b. unable to contact their clients between court appearances;

 c. unable to conduct significant investigation or discovery;

 d. unable to engage in significant motion practice;

 e. unable to gather information needed for effective plea negotiations;

 f. unable to engage in sufficient trial preparation; and

 g. unable to [ ] litigate appeals because of a lack of appellate experience.

Amended Complaint, 5/15/2013, at 34, ¶ 106. In count II, Appellants alleged a violation of the Civil Rights Act. See 42 U.S.C. § 1983. Specifically, Appellants claimed that Appellees' refusal to provide the OPD with adequate funding resulted in a violation of the indigent plaintiffs' right to counsel pursuant to the Sixth and Fourteenth Amendments to the United States Constitution. Finally, in count III, Appellants asserted a violation of the right to counsel enshrined in Article I, Section 9 of the Pennsylvania Constitution, for the same reasons set forth in counts I and II.

In their prayer for relief, Appellants sought a writ of mandamus and a permanent injunction compelling Appellees to provide whatever funding was necessary to meet the demands of representing the indigent population being charged with crimes in Luzerne County, attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief that the court saw fit.

On June 3, 2013, in light of the federal section 1983 claim raised by plaintiffs, Appellees removed the case to the United States District Court for the Middle District of Pennsylvania. See 28 U.S.C. § 1441 ("[A]ny civil action brought in a State court of which the district courts of the United States have

original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."). However, on August 26, 2013, upon Appellants' motion, the District Court remanded the matter to state court for disposition.

On September 11, 2013, Appellees filed preliminary objections to the amended complaint. Specifically, Appellees contended, *inter alia*, that Flora lacked standing because he no longer was the Chief Public Defender in Luzerne County; that the individual plaintiffs lacked standing to contest government budgeting; and that Appellants had failed to state a cause of action under either their claim for mandamus relief or their claims of constitutional violations. Regarding mandamus, Appellees noted that, to be entitled to mandamus, a party must demonstrate a clear right to relief. Because budgetary decisions are discretionary, private citizens do not have a clear right to any form of relief, thus precluding a mandamus remedy. As to the alleged constitutional violations and the request for a permanent injunction, Appellees argued that Appellants had failed to demonstrate that they suffered any present injuries, the likelihood of immediate or irreparable harm, or the unavailability of other remedies at law.

Shortly thereafter, Appellees filed a motion to disqualify plaintiffs' counsel. According to the Appellees' motion, counsel for plaintiffs went to the Luzerne County Correctional Facility and met with individuals who were represented by the OPD without the permission of the OPD attorneys representing those individuals, in an effort to find new plaintiffs to be named in the lawsuit. Appellees alleged that this interaction violated, *inter alia*, Pennsylvania Rule of Professional Conduct 4.2, which provides that, "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Pa.R.P.C. 4.2.

Following briefing by both parties on the preliminary objections and the motion to disqualify counsel, the trial court heard oral arguments on October 8, 2013. On October 21, 2013, the trial court denied the motion to disqualify plaintiffs' counsel. On the following day, October 22, 2013, the trial court sustained Appellees' preliminary objections to Flora's and the individual plaintiffs' standing, and sustained Appellees' preliminary objection upon the basis that Appellants had failed to state a cause of action for mandamus or a constitutional violation. The trial court dismissed the amended complaint. Contemporaneously, the trial court issued an opinion explaining the basis for its rulings.

On November 20, 2013, Appellants filed a notice of appeal from the order sustaining Appellees' preliminary objections. On December 2, 2013, Appellees filed a cross-appeal from the order denying their motion to disqualify plaintiffs' counsel. On December 19, 2013, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a), in which the court incorporated the rationale set forth in its October 22, 2013 opinion.

In a published decision, the Commonwealth Court unanimously affirmed the trial court. Flora v. Luzerne Cty., 103 A.3d 125, 140 (Pa. Cmwlth. 2014). The court first held that Flora lacked traditional standing to sue Appellees. Citing Pittsburgh Palisades Park, LLC v. Commonwealth, 585 Pa. 196, 888 A.2d 655, 660 (2005), the Commonwealth Court explained that Flora was not personally aggrieved by Luzerne County's alleged failure to fund the OPD, and therefore could not establish that he had a "substantial, direct, and immediate interest in the outcome of the litigation." Flora, 103 A.3d at 131–32 (quoting Pittsburgh Palisades, 888 A.2d at 660).

The court then held that Flora also lacked taxpayer standing. In order to establish such standing, a taxpayer must demonstrate that (1) the governmental action would otherwise go unchallenged; (2) those directly and immediately affected by the complained-of expenditures are beneficially affected and not inclined to challenge the action; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other persons are better situated to assert the

claim. Id. at 132 (citing Consumer Party of Penna. v. Commonwealth, 510 Pa. 158, 507 A.2d 323, 329 (1986), *abrogated on other grounds by* Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth, 583 Pa. 275, 877 A.2d 383 (2005)). The court explained that the individual plaintiffs' claims—that they were deprived of, or would be deprived of, effective assistance of counsel—could be addressed in the individual criminal cases. Hence, the deprivations would not go unchallenged. Second, the court noted that Flora no longer is the Chief Public Defender, and that the new Chief Public Defender could choose to pursue any claims available to the office. Finally, the court noted that the claims could be addressed through other channels, most notably the annual budgetary process. For these reasons, the court held that Flora could not satisfy the test to establish taxpayer standing.

The court then turned its attention to the individual plaintiffs' standing and examined whether they had stated a cause of action. The court summarized the parties' arguments, and then, without explanation, declared that "[t]he argument on standing merges with the question of whether the amended complaint states a claim upon which relief can be granted." Id. at 133. Accordingly, the court considered the two issues together.

The court initially directed its attention to the Sixth Amendment, and the circumstances under which a defendant traditionally could obtain relief for a violation of the right to counsel. The court noted that, pursuant to Gideon, states must provide an indigent defendant with an attorney, and that the state must do so at the earliest point at which a defendant has the right to have an attorney present. Id. (citing Montejo v. Louisiana, 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009)). Hence, if a state does not provide a lawyer to an indigent defendant, the accused may bring a claim of actual denial of counsel. Id. (citing United States v. Cronic, 466 U.S. 648, 649, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)).

The court next explained that, per Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), indigent defendants are entitled to effective assistance of

counsel; if counsel fails in that duty, the remedy is a new trial. To be entitled to relief under Strickland, a defendant must demonstrate that his attorney "performed below a standard of objective reasonableness and that counsel's performance resulted in actual prejudice to the defendant." Flora, 103 A.3d at 134 (citing Strickland, 466 U.S. at 687–88, 104 S.Ct. 2052). Such a claim, the court pointed out, can be brought only after the defendant has been tried and convicted. In some instances, as the United States Supreme Court explained in Cronic, a lawyer's performance falls so far below the constitutional baseline that prejudice can be presumed without an objective examination of trial counsel's actual performance. Still, this too may occur only after the defendant has been convicted. Neither decision, according to the Commonwealth Court, addressed whether an indigent defendant can seek prospective relief.

Regarding such a claim, the Commonwealth Court considered three cases from other jurisdictions that have recognized a prospective cause of action for a violation of the right to counsel: Luckey v. Harris, 860 F.2d 1012 (11th Cir. 1988), Hurrell–Harring v. New York, 15 N.Y.3d 8, 904 N.Y.S.2d 296, 930 N.E.2d 217 (2010), and Duncan v. Michigan, 284 Mich.App. 246, 774 N.W.2d 89 (2009). In Luckey, the United States Court of Appeals for the Eleventh Circuit held that class action plaintiffs who sought additional funding could proceed with their lawsuit, because, although they could not prove ineffective assistance of counsel in advance of trial, they nonetheless could suffer harm as a result of inadequate pre-trial representation. The Court of Appeals held that, to proceed, such plaintiffs had to show a likelihood of substantial and immediate irreparable injury and the inadequacy of a remedy at law. In Hurrell–Harring, the New York Court of Appeals held, inter alia, that Strickland applies only in the post-conviction setting, and is distinguishable from pre-trial claims challenging whether states were meeting their "foundational obligation under Gideon" to provide competent legal counsel. Hurrell–Harring, 904 N.Y.S.2d 296, 930 N.E.2d at 222. Hence, the Court allowed a claim that the criminal defense lawyers were

so overburdened that no attorney-client relationship could have existed. In Duncan, the Michigan Court of Appeals rejected the view that Strickland provided the exclusive avenue for relief for violations of the right to counsel. It allowed the case to proceed in order to permit the plaintiffs to show the "existence of widespread and systemic instances of actual or constructive denial of counsel." Duncan, 774 N.W.2d at 124.

The Commonwealth Court found the majority holdings in these cases to be unpersuasive. Instead, it agreed with the dissents in Hurrell–Harring and Duncan. The dissent in Hurrell–Harring rejected the premise that systematic underfunding creates a Sixth Amendment violation, explaining that "constructive denial of counsel is a branch from the Strickland tree, with Cronic applying only when the appointed attorney's representation is so egregious that it's as if [the] defendant had no attorney at all." Hurrell–Harring, 904 N.Y.S.2d 296, 930 N.E.2d at 229 (Pigott, J., dissenting). In the Hurrell–Harring dissent's view, lumping together multiple claims of pretrial ineffective assistance of counsel did not create one unified claim of systematic failure. The dissent in Duncan would have found that prejudice is a necessary showing in any Sixth Amendment claim, and that Strickland provides an adequate remedy for any alleged violations.

The Commonwealth Court agreed with these dissents, citing three reasons. First, the court pointed out that the United States Supreme Court has never recognized a constructive denial of counsel claim in a civil case seeking prospective relief in the form of increased funding for an entire public defender's office. Flora, 103 A.3d at 136. In Strickland, Cronic, and Gideon, the defendant sought a new trial for himself, not increased funding for an office. Second, the court explained that, even if a claim for funding was cognizable, Appellants failed to satisfy the requisite standard in their amended complaint. Invoking a Strickland prejudice standard, the court determined that Appellants' allegations of inadequate representation by the OPD attorneys did not create circumstances that are "so likely [to create prejudice] that case-by-case inquiry into prejudice is not worth the cost." Flora, 103 A.3d

at 137 (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). Similarly, in the Commonwealth Court's view, Appellants did not prove that they have suffered or will suffer irreparable harm; rather, they asserted only their fear that they might not be represented adequately. This, the court held, was speculation; it was not harm.

Third, the Commonwealth Court highlighted the United States Supreme Court's pronouncement that the purpose of the right to counsel is "simply to ensure that a criminal defendant receives a fair trial." Id. (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). Hence, the Commonwealth Court held, because an indigent defendant is not entitled to perfect counsel or a perfect trial, prejudice cannot be presumed from the circumstances presented in the amended complaint.

Finally, the court held that mandamus relief is unavailable to Appellants. The court noted that, in order to obtain the extraordinary injunctive remedy of mandamus, a plaintiff first must make a very strong showing that he or she has a clear right to relief. Id. at 138 (citation omitted). Because funding is a discretionary act, Appellants could not establish the existence of a clear legal right. Further, the court expressed concerns that ordering a county to fund a particular office in a certain way could violate the separation of powers doctrine, because the judicial branch generally may not review discretionary acts of the other branches of government. Id.

We granted *allocatur* to review the following issues:

a. In a matter of first impression, do [Appellants] state a claim for constructive denial of counsel under the Sixth and Fourteenth Amendments to the United States Constitution, and Article 1, Section 9 of the Pennsylvania Constitution, based on chronic and systemic deficiencies in the operation of Luzerne County's Office of the Public Defender that deprive them and the class they seek to represent of their right to effective assistance of counsel?

b. Do [Appellants] state a claim of mandamus to compel [Appellees] to provide adequate funding for Luzerne County's Office of the Public Defender, as required by

the Commonwealth's Public Defender Act [16 Pa.C.S.
§§ 9960.10-9960.13]?

See Flora v. Luzerne Cty., 632 Pa. 145, 118 A.3d 385 (2015)
(*per curiam*). [4]

As noted, the overarching question presented in the first
issue is whether there exists a cause of action for injunctive
relief compelling a county to increase public defender funding
in response to prospective claims of right to counsel violations.
This is a question that this Court has never had occasion to
resolve. The parties and amici present several arguments
relevant to such a claim.

Appellants contend that the Commonwealth Court errone-
ously held that a violation of the right to counsel can be
remedied only after trial and conviction upon a showing of
Strickland prejudice. To the contrary, Appellants assert, there
are multiple remedies available for violations of the rights
guaranteed by the Bill of Rights and the Fourteenth Amend-
ment, including injunctive relief. In such circumstances, the
plaintiffs must show "both denial of a right and the need for
an injunction to remedy on-going violations." Brief for Appel-
lants at 19 (citing Allee v. Medrano, 416 U.S. 802, 94 S.Ct.
2191, 40 L.Ed.2d 566 (1974)).

Appellants first address whether Strickland is an available
remedy for the specific claims that they have raised. Appel-
lants note that Strickland addressed two questions: (1) wheth-
er there was a right to effective assistance of counsel; and (2)
if so, what legal standard governs when that right was violated
but the defendant has been convicted and is seeking a new
trial. Once the Supreme Court answered the first question in
the affirmative, it then was required to balance the interest of
the defendant in receiving effective assistance of counsel (in-
cluding counsel's professional discretion in choosing and em-
ploying trial strategies) against the state's interest in avoiding
retrial of a defendant whose counsel's ineffectiveness had no

4. We did not grant review of Appellants' claim that the Commonwealth
Court incorrectly held that Flora lacked standing. Accordingly, Flora no
longer is a party to this case. The caption has been adjusted to reflect
this change.

material effect on the outcome of the trial. To address the latter circumstance, the Supreme Court established the prejudice standard. Consequently, according to Appellants, Strickland applies only in the post-conviction context. In the pretrial context, the state does not have the same interest in avoiding retrial, and Strickland has no application.

Whether the right was violated, and whether the violation should result in a particular remedy, are two separate issues. Appellants assert that a violation of the right to counsel can occur at any time, and, because Strickland was limited to the specific balancing of interests that emerge in the post-conviction context, different remedies must be available.

Appellants also maintain that Strickland and Gideon create a range of rights that is broader than those that can be vindicated solely in post-conviction proceedings. For instance, Appellants point out that a lawyer may fail to file motions, interview witnesses, or investigate facts, each of which failures might violate the right to effective representation. Yet, it would be difficult, and often impossible, to prove that any such failures caused Strickland-type prejudice, rendering such violations forever irremediable.

Appellants further note that post-conviction remedies apply only to violations that affect the outcome of the trial, and provide no equitable relief for systematic or structural violations of the right to counsel that occur during pretrial proceedings. Moreover, Appellants explain, many defendants will suffer a pretrial violation of the right to counsel, but will never file a petition for post-conviction relief, either because they pleaded guilty or because their sentences expired during direct appeal. Appellants contend that, without the ability to seek a pretrial remedy, countless violations of the right to counsel due to systematic failures in public defender offices will occur and will remain unchallenged. Relying upon Luckey and Duncan, Appellants argue that the inability of a defendant to demonstrate Strickland-type prejudice does not mean that the defendant has not suffered harm, which occurs any time the right to counsel is violated.

Finally, Appellants assert that the averments in their amended complaint establish that the systematic underfunding of the OPD resulted in the constructive denial of counsel to them and to the class that they represent. Their averments highlight routine failures of counsel, including the inability to meet with clients, investigate defenses, or prepare for trial. In the amended complaint, Appellants do not target individual attorneys, nor do they detail specific instances of such failures. Rather, Appellants argue that the chronic underfunding has created systematic constraints on the OPD, which prevent that office's attorneys from providing competent and effective legal representation during the pretrial stages, a deficiency which, they contend, is sufficient to state a claim for prospective injunctive relief.

Appellants are supported by numerous amici curiae. The United States Department of Justice maintains that a civil claim for constructive denial of counsel is cognizable under the Sixth Amendment. The Department asserts that a claim for constructive denial of counsel is "both legitimate and rooted in U.S. Supreme Court case law." *Amicus* Brief for the United States at 12 (citing Cronic, 466 U.S. at 659–60, 104 S.Ct. 2039). Prospective injunctive relief for such a claim is viable, argues the Department:

> (1) when, on a system-wide basis, the traditional markers of representation—such as timely and confidential consultation with clients, appropriate investigation, and meaningful adversarial testing of the prosecution's case—are absent or significantly compromised; and (2) when substantial structural limitations—such as a severe lack of resources, unreasonably high workloads, or critical understaffing of public defender offices—cause that absence or limitation on representation.

Id. at 11. In the Department's view, when the totality of the circumstances indicates a "system-wide problem of nonrepresentation," *i.e.,* the appointment of counsel is merely cosmetic and the defendant has a lawyer in name only, prospective relief must be available.

In their *amicus* brief, the Innocence Network and the Pennsylvania Innocence Project (collectively, "the Innocence Project") argue that underfunding of public defenders' offices threatens the adversarial truth-determining process. They note that inadequate representation is the largest contributor to erroneous convictions. Overburdened attorneys cannot provide the representation necessary to ensure that innocent defendants are not convicted in circumstances where competent counsel would secure an acquittal. Similarly, attorneys without the time and resources necessary to provide a meaningful defense all too often negotiate disadvantageous guilty pleas quickly to reduce their caseloads, often encouraging even innocent defendants to accept pleas in order to avoid delays in the resolution of cases and to abbreviate pretrial incarceration. Like Appellants, the Innocence Project argues that Strickland does not—and was not intended to—address pretrial claims of systematic ineffectiveness. Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46, also is not a viable vehicle to address systematic pretrial failures due to the strict procedural hurdles that a defendant seeking relief must overcome, including the requirement that the person be serving a sentence not only when relief is sought but throughout the sometimes lengthy period required to dispose of PCRA claims. See id. § 9543(a)(1).

The National Association of Criminal Defense Lawyers and the Pennsylvania Association of Criminal Defense Lawyers (collectively, "the Associations") argue that Appellants adequately have pleaded a claim of constructive denial of counsel in their amended complaint. The Associations join Appellants in arguing that Strickland cannot remedy prospective civil claims of constructive denial of counsel. The Associations maintain that "[t]o suggest that the Sixth Amendment cannot be enforced except where deficient representation led to a wrongful conviction both contravenes [United States Supreme Court precedent] and demonstrates a misconception of the role of defense counsel in the adversarial criminal justice system." *Amicus* Brief for the Associations at 15. The Associations assert that such a view "also underestimates the power

of the courts to ensure that rights are not systematically violated in addition to their important role in affording individualized remedies after a violation [has] occurred." Id.

Finally, the American Bar Association ("the ABA") echoes the other amici and Appellants in calling upon this Court to recognize a cause of action where the public defender workloads and lack of funding prevent indigent defendants from receiving the "actual, non-trivial representation that Gideon demands." Amicus Brief for the ABA at 7. The ABA notes that "52 years of post-Gideon history and precedent show that individual, retrospective ineffective assistance of counsel claims brought after trial cannot address chronic, systemic problems such as those alleged in this case." Id. The ABA argues that Strickland-type post-conviction relief not only would fail to remedy the civil claims asserted by Appellants, but also would fail to hold a public defender's office or the funding county to account for non-compliance with Gideon. Strickland can provide a remedy only to one person at a time. Such sporadic, piecemeal rulings are unlikely to compel public defender's offices to make necessary changes, or to induce counties to provide the resources necessary to provide meaningful legal representation to indigent defendants.

Appellees respond that the Sixth Amendment is not as broad as Appellants portray it to be. They maintain that a state violates the right to effective assistance of counsel only by interfering "in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." Brief for Appellees at 19 (citing Strickland, 466 U.S. at 686, 104 S.Ct. 2052). An indigent defendant can make a pretrial attack on the effectiveness of his attorney only if he or she demonstrates prejudice so obvious and substantial that it amounts to a constructive denial of counsel. Id. at 20 (citation omitted).

Regarding Appellants' specific claims, Appellees point out that Appellants have not alleged in any way that they were deprived of counsel. To the contrary, Appellants Kuren and Allabaugh both have been assigned counsel by the OPD. Their respective attorneys have entered appearances and filed dis-

covery motions. Furthermore, Appellants cannot direct this Court's attention to any particular action by their lawyers that amounts to ineffective assistance. Rather, Appellants expressed dissatisfaction with the attorneys assigned to them, and "believed" that counsel ultimately would not devote enough attention to their cases. Appellees contend that these claims are conjectural and fall short of establishing constructive denial of counsel. Appellants frame their pleadings in terms of what they believe might happen, or as presumptions amounting to nothing more than generalized allegations, rather than concrete claims upon which relief can be granted.

Appellees also argue that Appellants' claims are not ripe for review. Appellees do not contend that a civil cause of action for prospective relief is never cognizable. Rather, Appellees argue that the United States Supreme Court's decision in O'Shea provides the test that Appellants must satisfy; to wit, a plaintiff seeking prospective relief must demonstrate "the likelihood of substantial and immediate irreparable injury and inadequacies of legal remedies." O'Shea, 414 U.S. at 502, 94 S.Ct. 669. Appellees urge us to conclude that Appellants' claims are too speculative to satisfy this test. The only time that Appellants, or anyone else in the class, were deprived of the right to counsel was when Flora, himself, rejected indigent applicants for representation. To date, as no deprivations have occurred by virtue of the Appellees' actions or decisions, and because Appellants have not pleaded any facts that are more than speculative, Appellants' claims are not ripe for review.[5]

## II. Discussion

We begin, as we must, with the parameters and purposes of the right to counsel protected by the Sixth Amendment to the United States Constitution.[6] The Amendment guarantees that,

5. Before us, Appellees no longer argue, as they have consistently throughout these proceedings, that Appellants lack standing to pursue relief.

6. We do not provide a separate discussion of the right to counsel enshrined in Article I, Section 9 of the Pennsylvania Constitution. It is now well-settled that the right to counsel recognized in Article I, Section 9 and in the Sixth Amendment of the United States Constitution

"[i]n all criminal prosecutions," an accused shall enjoy the right "to have the assistance of counsel for his defence." U.S. Const., Amend. VI. "No one doubts the fundamental character" of the right. <u>Luis v. United States</u>, —— U.S. ——, 136 S.Ct. 1083, 1088, 194 L.Ed.2d 256 (2016). The right to counsel "is one of the safeguards of the Sixth Amendment deemed necessary to [e]nsure fundamental human rights of life and liberty," and serves as one of the "essential barriers against arbitrary or unjust deprivation of human rights." <u>Johnson v. Zerbst</u>, 304 U.S. 458, 462, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). "The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.'" <u>Id.</u> (citing <u>Palko v. Connecticut</u>, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)).

 "The essence of this right ... is the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial." <u>Michigan v. Harvey</u>, 494 U.S. 344, 348, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (citations omitted). "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." <u>Montejo</u>, 556 U.S. at 786, 129 S.Ct. 2079 (citing <u>United States v. Wade</u>, 388 U.S. 218, 227–28, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); <u>Powell v. Alabama</u>, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932)).

> [T]he Court has also recognized that the assistance of counsel cannot be limited to participation in a trial; **to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.** Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, [the Court has] found that the right attaches at earlier, "critical" stages in the criminal justice process "where the results might well settle the accused's fate and reduce the trial itself to a mere formality." <u>United States v. Wade</u>, 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d

are jurisprudentially coextensive. <u>See</u> <u>Commonwealth v. Wholaver</u>, 605 Pa. 325, 989 A.2d 883, 897 (2010).

1149 (1967) (quoted in United States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). See, e.g., Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). And, "[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him . . . ." Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). This is because, after the initiation of adversary criminal proceedings, " 'the government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " Gouveia, supra (quoting Kirby v. Illinois, supra).

Maine v. Moulton, 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (citations modified; emphasis added). The denial of the right at any stage constitutes a structural defect that must be remedied, because any such error "affec[ts] the framework within which the trial proceeds." United States v. Gonzalez–Lopez, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (citations omitted).

Writing for the United States Supreme Court in Johnson, Justice Hugo Black explained the significance of the right to counsel:

[The right to counsel] embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel. That which is simple, orderly, and necessary to the lawyer [ ] to the untrained layman [ ] may

appear intricate, complex, and mysterious. Consistently with the wise policy of the Sixth Amendment and other parts of our fundamental charter, this Court has pointed to '* * * the humane policy of modern criminal law * * *' which now provides that a defendant '* * * if he be poor, * * * may have counsel furnished to him by the state, * * * not infrequently * * * more able than the attorney for the state.'

The '* * * right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defence, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him.

Johnson, 304 U.S. at 462–63, 58 S.Ct. 1019 (citing Powell, 287 U.S. at 69, 53 S.Ct. 55) (some footnotes omitted). As Justice Black noted, the benefits of the Sixth Amendment right to counsel extended at the time only to those charged in federal court. Id. at 463, 58 S.Ct. 1019.

The Sixth Amendment right to counsel remained limited to federal proceedings for another twenty-five years, until the Court issued its watershed decision in Gideon. The State of Florida charged Clarence Earl Gideon with entering into a poolroom with the intent to commit a misdemeanor, a crime that Florida law graded as a felony. Gideon, 372 U.S. at 336–37, 83 S.Ct. 792. Indigent, Gideon asked the trial court to appoint a lawyer to represent him. The trial court informed Gideon that Florida law at the time required a court to appoint counsel only when the defendant was facing a capital offense, and accordingly denied his request. Id. at 337, 83 S.Ct. 792.

Gideon represented himself, performing (by the Supreme Court's account) well for a layperson. Despite his efforts, Gideon was convicted and sentenced to five years in prison. Gideon appealed his conviction to the Florida Supreme Court, maintaining at all times that the Sixth Amendment required the state court to appoint an attorney to represent him in the state criminal proceeding. At the time that the Florida Supreme Court considered Gideon's case, the United States Supreme Court's decision in Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), was the controlling precedent. In Betts, relying exclusively upon the Due Process Clause of the Fourteenth Amendment, a sharply divided Court held that the right to counsel was not so fundamental that it must be extended to the states, and that state courts did not necessarily violate due process by refusing to appoint counsel to indigent defendants facing felony charges. Betts, 316 U.S. at 462, 473, 62 S.Ct. 1252. Presumably relying upon Betts, the Florida Supreme Court denied Gideon relief in an order with no opinion. Gideon, 372 U.S. at 337, 83 S.Ct. 792.

The United States Supreme Court granted Gideon's petition for writ of certiorari, noting that Betts "has been a continuing source of controversy," and directing the parties to address the question of whether Betts should be reconsidered. Gideon, 372 U.S. at 338, 83 S.Ct. 792. Ultimately, the Court overruled Betts, holding that, when Betts was decided, there was "ample precedent for acknowledging that those guarantees of the Bill of Rights which are fundamental safeguards of liberty immune from federal abridgment are equally protected against state invasion by the Due Process Clause of the Fourteenth Amendment." Id. at 341, 83 S.Ct. 792. The Court firmly rejected the Betts Court's exclusion of the Sixth Amendment right to counsel from those rights that must be recognized by both federal and state courts.

Expounding upon the fundamental nature of the right to counsel, the Court explained as follows:

reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a

fair trial unless counsel is provided for him. This seems to us to be an obvious truth. Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have money hire lawyers to defend are the strongest indications of the wide—spread belief that lawyers in criminal cases are necessities, not luxuries. The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

Id. at 344, 83 S.Ct. 792. Holding that the Sixth Amendment right to counsel is obligatory upon the states, the Court directed states to provide lawyers for indigent criminal defendants.

It is clear that, by operating the OPD, Luzerne County facially has attempted to comply with Gideon's mandate. The question in this case goes beyond facial compliance. This Court must decide whether the mere existence of a public defender's office and the assignment of attorneys by that office are sufficient to satisfy Gideon. The answer is obvious: Gideon's clear command to state courts would be a dead letter if states—or the counties that comprise them—need only go through the motions. The Court's eloquent descriptions in Johnson and Gideon of the essential nature of the right to a lawyer would ring hollow, and would amount to empty rhetoric, if appointment of counsel for indigent defendants is but a mere formality. It is the defense itself, not the lawyers as

such, that animates <u>Gideon</u>'s mandate. If the latter cannot provide the former, the promise of the Sixth Amendment is broken.

No other guarantee in the Bill of Rights that affects the criminal justice system parallels the right to counsel in its universality. That is not to say that other rights are less critical to our system of limited government and ordered liberty. For instance, violations of the Fourth Amendment may result in suppression of evidence, while another provision of the Sixth Amendment requires that defendants be brought to trial in a speedy manner, and the Eighth Amendment ensures that convicted defendants are not subject to cruel and unusual punishment. Even so, these latter provisions are not implicated in **every** criminal case. By contrast, the right to counsel plays a significant role in every single case. What is more, it is relevant at almost every stage of every criminal case. In <u>Cronic</u>, the Supreme Court recognized this unique pervasiveness of the right to counsel, emphasizing that "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive[,] for it affects his ability to assert any other rights he may have." <u>Cronic</u>, 466 U.S. at 654, 104 S.Ct. 2039 (quoting Walter Schaefer's "Federalism and State Criminal Procedure," 70 Harv.L.Rev. 1, 8 (1956)).

The <u>Cronic</u> Court further explained why the right to counsel cannot be treated as a rote formality:

The special value of the right to the assistance of counsel explains why [i]t has long been recognized that the right to counsel is the right to effective assistance of counsel. <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The text of the Sixth Amendment itself suggests as much. The Amendment requires not merely the provision of counsel to the accused, but "Assistance," which is to be "for his defence." Thus, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." <u>United States v. Ash</u>, 413 U.S. 300, 309, 93 S.Ct. 2568,

37 L.Ed.2d 619 (1973). If no actual "Assistance" "for" the accused's "defence" is provided, then the constitutional guarantee has been violated. To hold otherwise

> "could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940) (footnote omitted).

Id. at 654–55, 104 S.Ct. 2039 (footnote omitted; citations modified).

The crux of Appellants' argument is that the inadequate funding created a system in Luzerne County where the OPD attorneys, even when assigned and appearing in court, are so handicapped in the time and resources that they can dedicate to each defendant that their presence amounts to a mere formality. In other words, as currently funded, the OPD is systematically incapable of providing constitutionally adequate representation such that the indigent defendants who receive the OPD's services effectively are denied counsel. Appellants make no individual claims of ineffective assistance of counsel. Rather, Appellants challenge the system itself.

In Cronic, the Supreme Court delineated two types of denial of counsel, actual and constructive. The Court explained:

> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable . . . .

> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so

small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

Id. at 659–60, 104 S.Ct. 2039 (footnote and citations omitted).

From these precedents, certain unmistakable and undisputed principles emerge. The right to counsel is fundamental, pervasive, and necessary to protect a defendant's right to a fair trial. The appointment of an attorney to represent an indigent defendant cannot be relegated to a mere formality. Counsel can be denied either actually or constructively. Those precepts are not controversial, and they provide the necessary backdrop for our decision.

Appellants allege that the circumstances in Luzerne County amount to a constructive denial of counsel. Although Cronic recognized such a denial as a constitutional violation, the circumstances in that case were markedly different than those present in the case at bar. Cronic addressed a post-conviction claim, and focused upon whether a post-conviction petitioner must demonstrate prejudice after being constructively denied counsel. The Cronic Court did not address whether constructive denial of counsel claims could be brought prospectively in a civil suit, nor did it address whether injunctive relief was a viable remedy for such a deprivation. Thus, Cronic's value to Appellants is limited. Because this Court also has never addressed the viability of such claims, we turn our focus to the leading cases from jurisdictions that have done so, cases upon which the parties and the lower courts have relied.

In Luckey, a class claiming to represent indigent criminal defendants who had been charged with crimes or who would be charged in the future with crimes filed a section 1983 action against the governor of Georgia and other state officials alleging that:

systemic deficiencies including inadequate resources, delays in the appointment of counsel, pressure on attorneys to hurry their clients' case to trial or to enter a guilty plea, and inadequate supervision in the Georgia indigent criminal defense system deny indigent criminal defendants their Sixth Amendment right to counsel, their due process rights

under the Fourteenth Amendment, their right to bail under the Eighth and Fourteenth Amendments and equal protection of the laws guaranteed by the Fourteenth Amendment. Luckey, 860 F.2d at 1013 (capitalization modified). The United States District Court for the Northern District of Georgia dismissed the suit and held that the class failed in its complaint to state a claim for which relief could be granted. Id. The Court of Appeals for the Eleventh Circuit reversed.

The Court of Appeals first ruled that the suit was not barred by the Eleventh Amendment. The Court of Appeals then held that the class had stated a cognizable claim. The District Court had ruled that, in order to obtain prospective, injunctive relief, the class plaintiffs had to prove the inevitability of constitutionally ineffective assistance by appointed counsel. Id. at 1016–17. The Court of Appeals overturned this ruling, explicitly rejecting as "inappropriate" the notion that Strickland is the governing standard in a civil suit seeking prospective relief. The Court of Appeals elaborated as follows:

> The Sixth Amendment protects rights that do not affect the outcome of a trial. Thus, deficiencies that do not meet the "ineffectiveness" standard may nonetheless violate a defendant's rights under the Sixth Amendment. In the post-trial context, such errors may be deemed harmless because they did not affect the outcome of the trial. Whether an accused has been prejudiced by the denial of a right is an issue that relates to relief—whether the defendant is entitled to have his or her conviction overturned—rather than to the question of whether such a right exists and can be protected prospectively.
>
> * * *
>
> Where a party seeks to overturn his or her conviction, powerful considerations warrant granting this relief only where the defendant has been prejudiced. The Strickland Court noted the following factors in favor of deferential scrutiny of a counsel's performance in the post-trial context: concerns for finality, concern that extensive post-trial burdens would discourage counsel from accepting cases, and concern for the independence of counsel. [Strickland, 466

U.S. at 690, 104 S.Ct. 2052]. These considerations do not apply when only prospective relief is sought.

Id. at 1017 (capitalization modified; citations omitted).

The Court of Appeals then noted that prospective relief differs from post-conviction relief in that the former seeks to prevent future harm, while the latter is an attempt to remedy an existing harm. The Court of Appeals held that, for prospective claims of constitutional violations, the class plaintiffs' burden is to demonstrate "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." Luckey, 860 F.2d at 1017 (quoting O'Shea, 414 U.S. at 502, 94 S.Ct. 669). "[W]ithout passing on the merits of [the allegations in the suit]," the Court of Appeals concluded that those allegations, as set forth above, were sufficient to state a claim upon which relief could be granted. Id. at 1018.

In Duncan, the Court of Appeals of Michigan addressed a similar set of circumstances. There, the court confronted the question of whether "the named plaintiffs, along with members of the certified class, i.e., present and future indigent defendants subject to felony prosecutions, . . . have been, are being, and will be denied their state and federal constitutional rights to counsel and the effective assistance of counsel," due to the "inadequate funding and lack of fiscal and administrative oversight." Duncan, 774 N.W.2d at 97. In a "highly detailed complaint," the class alleged that the indigent defense systems in several Michigan counties were "underfunded, poorly administered, and [did] not ensure that the participating defense attorneys have the necessary tools, time, and qualifications to adequately represent indigent defendants and to put the cases presented by prosecutors to the crucible of meaningful adversarial testing." Id. at 99. The class averred that the system, as it existed at the time of the complaint, was deficient in, inter alia: client eligibility standards; attorney hiring; attorney training; conflict of interest guidelines; and independence from the prosecution and judiciary. These deficiencies, the class asserted, resulted in wrongful convictions, longer terms of incarceration, guilty pleas lacking in evidentiary foundations, unprepared counsel at hearings and trials, and

introduction of evidence that should have been suppressed or ruled inadmissible had counsel had the time and resources to prepare and file pretrial motions. Id.

Additionally, the class set forth various specific instances in which appointed counsel failed adequately to represent members of the class during their criminal cases. For instance, the class noted that counsel met with clients for the first time minutes before preliminary hearings commenced; advised clients to waive hearings and rights without full, confidential discussions of the consequences of such decisions; failed to provide police reports and other discovery materials to the client; and neglected to discuss the nature and factual support—or lack thereof—of the charges against the client. The class sought relief under section 1983 and declaratory and injunctive remedies under the Michigan Constitution. Id. at 99–100.

After examining the right to counsel, including the right to effective assistance of counsel and the various stages during a criminal case at which the right attaches, the Court of Appeals considered the justiciability of the claims raised by the class.[7] Regarding injunctive relief, the court employed the same test utilized by the Luckey Court, requiring a party seeking such relief to demonstrate the danger of irreparable and immediate injury with no other available remedy at law. Duncan, 774 N.W.2d at 119 (citing Pontiac Fire Fighters Union Local 376 v. City of Pontiac, 482 Mich. 1, 753 N.W.2d 595 (2008)). The Court of Appeals ultimately held that, in order for the class to succeed on the merits, the class "must prove widespread and systemic constitutional violations that are actual or imminent, constituting the harm necessary to establish justiciability." Id. at 121. The court then explained that, in assessing "justiciable harm," the focus must be on the allegations in the complaint. Id. at 123. To establish this category of harm, the court held, a class seeking prospective relief for widespread constitutional violations must demonstrate that court-appointed counsel's representation does not meet "an objective standard of rea-

7. The Court of Appeals also addressed a litany of other legal issues that are immaterial to our discussion.

sonableness" and produces "an unreliable verdict or unfair trial, when a criminal defendant is actually or constructively denied the assistance of counsel altogether at a critical stage in the proceedings, or when counsel's performance is deficient under circumstances in which prejudice would be presumed in a typical criminal case." Id. at 123. The Court of Appeals continued:

We further hold that injury or harm is shown when court-appointed counsel's performance or representation is deficient relative to a critical stage in the proceedings and, absent a showing that it affected the reliability of the verdict, the deficient performance results in a detriment to a criminal defendant that is relevant and meaningful in some fashion, e.g. unwarranted pretrial detention. Finally, we hold that, when it is shown that court-appointed counsels' representation falls below an objective standard of reasonableness with respect to a critical stage in the proceedings, there has been an invasion of a legally protected interest and harm occurs. Plaintiffs must additionally show that instances of deficient performance and denial of counsel are widespread and systemic and that they are caused by weaknesses and problems in the court-appointed, indigent defense systems employed by [the counties], which are attributable to and ultimately caused by the [counties'] constitutional failures. If the aggregate of harm reaches such a level as to be pervasive and persistent (widespread and systemic), the case is justiciable and declaratory relief is appropriate, as well as injunctive relief to preclude future harm and constitutional violations that can reasonably be deemed imminent in light of the existing aggregate of harm.

Id. at 123–24 (footnote and citation omitted).

The Duncan court acknowledged that these standards were varied and wide-ranging, but reasoned that they must be so in order to meet the numerous potential challenges that may arise when claims of "systemic" and "widespread" constitutional violations are leveled. The Court of Appeals further recognized that these standards create a hefty burden for classes to satisfy and that trial courts in the first instance will

have to determine the parameters of the terms "widespread" and "systemic." Nonetheless, the class' averments alleged a real, not hypothetical, harm that warranted permission for the lawsuit to proceed. Id. at 124.

The Court of Appeals then rejected the argument that class plaintiffs could find a remedy at law in Strickland. Relying upon Luckey and other court state decisions that also have rejected the application of Strickland to this type of case, as well as the presumption of prejudice established by the Cronic Court, the Court of Appeals explained that the Strickland rubric simply is too rigid to address the "many shapes and forms" that harm resulting from a violation of the right to counsel can take. The court noted that when Strickland—type prejudice results, justiciable harm certainly has occurred. However, harm also may occur when "there are instances of deficient performance by counsel at critical stages in the criminal proceedings that are detrimental to an indigent defendant in some relevant and meaningful fashion, even without neatly wrapping the justiciable harm around a verdict and trial." Duncan, 774 N.W.2d at 127. Examples of such harm include unnecessarily prolonged detention before trial or plea, failure to file potentially meritorious motions, and the entry of guilty pleas lacking a factual basis.

The court then reviewed the allegations of the complaint and held that the class had sufficiently pleaded facts that, if true, justified allowing the cause of action to proceed, regardless of whether the class ultimately could prove its claims at trial.[8]

8. After the Court of Appeals ruled in Duncan, the case proceeded along a complicated and presumably uncommon procedural trajectory that ultimately resulted in the Michigan Supreme Court affirming the Court of Appeals. Initially, on April 30, 2010, the Michigan Supreme Court, after oral argument, affirmed the Court of Appeals in a per curiam order. See Duncan v. State, 486 Mich. 906, 780 N.E.2d 843 (2010). Then, on July 16, 2010, the Michigan Supreme Court granted the State's motion for reconsideration, vacated the April 30, 2010 order, and reversed the Michigan Court of Appeals in another per curiam order. See Duncan v. State, 486 Mich. 1071, 784 N.W.2d 51 (2010). In that order, the Michigan Supreme Court noted briefly that the reversal was based upon the reasons set forth in the dissenting opinion from the Court of Appeals. Id. Finally, on December 22, 2010, the Michigan

In the case *sub judice*, the Commonwealth Court found the Duncan dissent persuasive. That dissent vehemently disagreed with the majority's analysis, accusing the majority of simply reformulating Strickland to create a prospective cause of action while simultaneously disavowing Strickland's relevance. Duncan, 774 N.W.2d at 174 (Whitbeck, J., dissenting). The dissent would have required satisfaction of the Strickland formula, including the traditional proof of actual prejudice, because prejudice "is an essential element of any Sixth Amendment violation." Id. Because the class in the case could not allege traditional prejudice prospectively, the dissent would have held that the class did not state a justiciable cause of action.

In Hurrell–Harring, the Court of Appeals of New York noted that, at the time the case commenced, New York delegated to the counties the duty to comply with Gideon. Hurrell–Harring, 904 N.Y.S.2d 296, 930 N.E.2d at 219. The class plaintiffs alleged that the delegation to the counties of the duty to provide indigent defendants with counsel was a "costly, largely unfunded and politically unpopular mandate" that "has functioned to deprive [indigent defendants] of constitutionally and statutorily guaranteed representational rights." Id. The plaintiffs sought declaratory and injunctive relief; they did not seek individual relief in their respective criminal cases. The defendants sought dismissal of the action, claiming that the suit was non-justiciable. The trial court denied the motion, but the intermediate appellate court reversed the trial court's order, and ruled that a violation of the right to counsel could not be vindicated in a civil proceeding seeking increased funding from county officials. The appellate court held that the only means to seek redress for an alleged violation of the right to counsel was in case-by-case post-conviction petitions. Id., 904 N.Y.S.2d 296, 930 N.E.2d at 219–20.

Supreme Court granted the class' motion for reconsideration of the July 16, 2010 order. The Court again reversed itself, and reinstated the April 30, 2010 order affirming the Court of Appeals. See Duncan v. State, 488 Mich. 957, 866 N.W.2d 407 (2010).

The New York Court of Appeals reversed the intermediate appellate court's decision. Before the high court, the defendants maintained their argument that the cause of action was not justiciable because: (1) claims for ineffective assistance of counsel are only cognizable when seeking relief from a criminal conviction, not before trial; and (2) claims for funding touch upon a legislative function, *i.e.*, how funds are allocated, an area upon which courts should not intrude. The Court of Appeals rejected both of these arguments.

First, the Court of Appeals acknowledged that a Strickland-based argument had "a measure of merit." Id. 904 N.Y.S.2d 296, 930 N.E.2d at 221. However, the court ultimately rejected the argument, holding that Strickland's approach "is expressly premised on the supposition that the fundamental underlying right to representation under Gideon has been enabled by the State in a manner that would justify the presumption that the standard of objective reasonableness will ordinarily be satisfied." Id. 904 N.Y.S.2d 96, 930 N.E.2d at 221. The Court of Appeals explained that the crux of a prospective cause of action is not rooted in whether counsel, individually or systematically, are ineffective under Strickland, but "rather [in] whether the State has met its foundational obligation under Gideon to provide legal representation." Id. 904 N.Y.S.2d 296, 930 N.E.2d at 222.

Because the plaintiffs' claims were not predicated exclusively upon the performance-prejudice standard, the court explained, those claims, to be cognizable, must be based upon more than alleged deprivation of meaningful and effective representation. The Court of Appeals examined the pleadings, and, viewing the averments in plaintiffs' favor, ruled that the plaintiffs had advanced more than mere allegations of deficient performance. The plaintiffs claimed that half of the class members named in the complaint did not have counsel assigned to them for their preliminary arraignments, and most of them were incarcerated because their bail was greater than they could afford. Those who were assigned counsel alleged that their attorneys were unavailable to them, sometimes for months; that those lawyers waived the accused's constitutional

rights without consultation; and that counsel served only "as conduits for plea offers, some of which purportedly were highly unfavorable." Id. Attorneys frequently missed court hearings, and were unprepared when they did appear:

Actual representation assumes a certain basic representational relationship. The allegations here, however, raise serious questions as to whether any such relationship may be really said to have existed between many of the plaintiffs and their putative attorneys and cumulatively may be understood to raise the distinct possibility that merely nominal attorney-client pairings occur in the subject counties with a fair degree of regularity, allegedly because of inadequate funding and staffing of indigent defense providers.

Id. 904 N.Y.S.2d 296, 930 N.E.2d at 224. These allegations, the Court of Appeals held, went well beyond routine claims of ineffective assistance of counsel, and stated "a claim for constructive denial of the right to counsel by reason of insufficient compliance with the constitutional mandate of Gideon." Id. 904 N.Y.S.2d 296, 930 N.E.2d at 225.

Addressing the argument that Strickland provides the only avenue for relief, the Court of Appeals responded as follows:

Collateral preconviction claims seeking prospective relief for absolute, core denials of the right to the assistance of counsel cannot be understood to be incompatible with Strickland. These are not the sort of contextually sensitive claims that are typically involved when ineffectiveness is alleged. The basic, unadorned question presented by such claims where, as here, the [criminal defendants] are poor, is whether the State has met its obligation to provide counsel, not whether under all the circumstances counsel's performance was inadequate or prejudicial. Indeed, in cases of outright denial of the right to counsel prejudice is presumed.

Id. The Court of Appeals conceded that some of the claims raised in this context have in the past been litigated under the Strickland paradigm, but held that "it does not follow from this circumstance that they are not cognizable apart from the post[-]conviction context." Id. "Given the simplicity and auton-

omy of a claim for nonrepresentation, as opposed to one truly involving the adequacy of an attorney's performance, there is no reason ... why such a claim cannot or should not be brought without the context of a completed prosecution." Id. 904 N.Y.S.2d 296, 930 N.E.2d at 225–26.

Finally, the Court of Appeals rejected the argument that a claim for increased funding is not justiciable:

> We have consistently held that enforcement of a clear constitutional or statutory mandate is the proper work of the courts, and it would be odd if we made an exception in the case of a mandate as well-established and essential to our institutional integrity as the one requiring the State to provide legal representation to indigent criminal defendants at all critical stages of the proceedings against them.

Id. 904 N.Y.S.2d 296, 930 N.E.2d at 227.

Like the dissent in Duncan, the dissent in Hurrell–Harring would not have recognized a cause of action for prospective relief. Hurrell–Harring, 904 N.Y.S.2d 296, 930 N.E.2d at 228 (Pigott, J., dissenting). In the dissent's view, the constructive denial claim that the majority recognized "is nothing more than an ineffective assistance of counsel claim under another name." Id. The Hurrell–Harring dissent agreed with the majority that Strickland was inapplicable, but would nonetheless have declined to recognize a constructive denial claim premised upon Cronic's presumed prejudice rationale. Such a claim, according to the dissent, was merely Strickland stripped of the prejudice prong, and it, too, generally should be restricted to individual claims of deficient stewardship. Hurrell–Harring, 904 N.Y.S.2d 296, 930 N.E.2d at 229 (Pigott, J., dissenting). Interestingly, the dissent did not opine that systemic constructive denial of counsel claims can never be cognizable. The dissent merely would have held that the plaintiffs' allegations did not rise to the level that would justify such a claim.

Unlike the Commonwealth Court, we find the majorities' reasoning in Luckey, Duncan, and Hurrell–Harring to be persuasive, and indeed, compelling. We now hold that there is a cognizable cause of action whereby a class of indigent

defendants may seek relief for a widespread, systematic and constructive denial of counsel when alleged deficiencies in funding and resources provided by the county deny indigent defendants their constitutional right to counsel. The consequences of holding otherwise would be untenable, and would be fundamentally irreconcilable with the United States Supreme Court's pronouncements on the role of the right to counsel in our system of justice.

Arguments to the contrary notwithstanding, Strickland does not limit claims asserting Sixth Amendment violations to the post-conviction context. The Strickland Court did not hold that post-conviction prejudice is a prerequisite for invocation of the right to counsel. Rather, prejudice in the post-conviction context largely is assessed by balancing the defendant's right to effective assistance of counsel against the state's interest in avoiding the burden of retrial where the ineffective assistance of counsel did not affect the outcome of the trial. Violations of the right to counsel can occur in many different ways, and remedies for such violations are not limited solely to circumstances where prejudice can be proven. Only the remedy of a new trial requires a showing of prejudice.

There is ample reason for considering Sixth Amendment violations in this manner. Because the right to a lawyer occupies a unique station in our system of justice, we must recognize that harm necessarily inheres in the deprivation of counsel, including at the earlier stages of a criminal case. The right to counsel is as important in the initial stages of a criminal case as it is at trial. To remedy only deprivations of the latter would foster subversion of the right as soon as it has attached. As the Court of Appeals of Michigan stated in Duncan, "there are instances of deficient performance at critical stages in the criminal proceedings that are detrimental to an indigent defendant in some relevant and meaningful fashion, even without neatly wrapping the justiciable harm around a verdict and trial." Duncan, 774 N.W.2d at 127.

In Moulton, the Supreme Court explained that "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." Moul-

ton, 474 U.S. at 170, 106 S.Ct. 477. It would be anomalous for us to hold that indigent defendants cannot challenge the system that is charged with providing representation during this undeniably critical time in the process. Certain types of harm are easily identifiable at this stage, harms that may not have an effect upon a trial itself. These include prolonged pretrial detention, potentially meritorious motions that go unfiled, and inadequate or nonexistent factual investigation, to name a few. Without an avenue to pursue relief for these harms, and countless others that arise from pretrial deprivations of the right to counsel, the Sixth Amendment right to counsel would erode into a right without a remedy.

Harm results from every violation of the right to counsel, as it does from any impingement upon a constitutionally protected interest. Duncan, 774 N.W.2d at 123–24. In the context of this case, harm results when widespread, systematic deficiencies deprive indigent defendants of the traditional markers of legal representation, such that those defendants are constructively denied counsel. A prospective claim based upon the constructive denial of counsel will lie when the alleged harm a plaintiff, or class of plaintiffs, demonstrates is caused by a county's failures, including failure to provide the means that ensure constitutionally adequate representation.

Because the justiciable harm alleged is prospective, in order to successfully plead the cause of action for equitable relief, a claimant must satisfy the test that the United States Supreme Court articulated in O'Shea. The claimant must demonstrate "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." O'Shea, 414 U.S. at 502, 94 S.Ct. 669. As noted earlier, Appellees concede that the O'Shea test is the applicable legal standard. See Brief for Appellees at 26. The first prong of the O'Shea test requires a party seeking injunctive relief to prove the "likelihood of substantial and immediate irreparable injury." This is not an insignificant burden, and it is apt in light of the fact that the claimant is seeking prospective relief. Nonetheless, relief is available, because the denial of the right to counsel, whether actual, or as here, constructive, poses a significant, and tangi-

ble threat to the fairness of criminal trials, and to the reliability of the entire criminal justice system.

■ As noted, the right to counsel is not a right that affects merely a subset of criminal cases, nor is it a right that is relevant only at certain junctures of the process. The right to be assisted by competent counsel attaches to nearly every aspect of the criminal process. For this reason, and because of the myriad circumstances in which the right can be denied or withheld, it would be impossible to delineate an exhaustive list of factors that an indigent plaintiff, or a class comprised of same, must satisfy in order to satisfy the first element of the O'Shea test. Nonetheless, we find that the standard proposed by the Department of Justice offers a workable, if nonexhaustive, paradigm for weighing such claims. The test bears repeating here. In setting forth a cause of action for prospective injunctive relief based upon the constructive denial of counsel, to prove the "likelihood of substantial and immediate irreparable injury," the plaintiff should focus upon the following factors:

(1) when, on a system-wide basis, the traditional markers of representation—such as timely and confidential consultation with clients, appropriate investigation, and meaningful adversarial testing of the prosecution's case—are absent or significantly compromised; and (2) when substantial structural limitations—such as a severe lack of resources, unreasonably high workloads, or critical understaffing of public defender offices—cause that absence or limitation on representation.

See *Amicus* Brief for the United States at 11.

This formulation reflects the fact that the right to counsel can be violated at nearly any time during the criminal process, and that justiciable harm may result from any violation of the right. This does not mean that every minor violation of the right necessitates injunctive relief. A plaintiff's burden to plead "substantial and immediate irreparable" injury is a weighty one.

The second prong of the test requires a plaintiff to demonstrate that no other adequate remedy at law exists for redress of the harm asserted. Appellees and the Commonwealth Court assert that Strickland provides the exclusive remedy for claims pertaining to violations of the right to counsel and that the relief it offers is sufficient. This argument ignores both the nature of Appellants' claims and the interests that the Supreme Court sought to protect in Strickland.

In Strickland, the Court granted certiorari to "consider the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction to be set aside because counsel's assistance at the trial or sentencing was ineffective." Strickland, 466 U.S. at 671, 104 S.Ct. 2052. In pursuing this inquiry, the Court first recognized that the right to counsel is a fundamental right that ensures that defendants, rich and poor alike, are subjected to a fair trial. Id. at 685, 104 S.Ct. 2052. "For that reason, the Court has recognized that the right to counsel is the right to effective assistance of counsel." Id. at 686, 104 S.Ct. 2052 (citing McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). A government can violate the right to effective assistance of counsel, for example by interfering with an attorney's ability to make decisions regarding the course of a defense. Similarly, the attorney herself or himself can deprive a defendant of the right to counsel "simply by failing to render 'adequate legal assistance.'" Id. (citing Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Until Strickland, the Court had not yet considered what effective assistance meant, nor the standards that a defendant must meet to prove that counsel was ineffective.

The Court explained that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. 2052. To effectuate this principle, the Court crafted a two-pronged standard for proving that trial or sentencing counsel was constitutionally ineffective:

A **convicted** defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687, 104 S.Ct. 2052 (emphasis added).

Regarding the first prong of the test, the Court noted that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688, 104 S.Ct. 2052. Seemingly recognizing the innumerable decisions and circumstances that attorneys face in a typical case, the Court declined to delineate an exhaustive list of actions that attorneys must undertake to render effective assistance. The Court then explained that appellate tribunals must be deferential in assessing counsel's performance, and must avoid hindsight and second-guessing. Id. at 689, 104 S.Ct. 2052.

As to the prejudice requirement, the Court explained that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691, 104 S.Ct. 2052. To prove prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052.

The Strickland Court crafted this test for courts to utilize when evaluating post-conviction claims of ineffective assistance of counsel. Convicted defendants stand in shoes very different from those worn by Appellants herein. As the Strickland Court noted in its opening paragraph, it was called upon to create a test that, if successful, would require judges to set aside criminal verdicts. In other words, Strickland is outcome-based, focusing in large part upon whether the trial itself was rendered unreliable by counsel's deficient performance. Inherent in that outcome-based analysis is the notion that states should not suffer the burden of multiple trials if counsel's constitutional derelictions did not affect the verdict. Other considerations undergirding the deferential two-part test included the interest in the finality of criminal convictions, the potential that court-appointed counsel would not be inclined to accept cases due to the burdens of extensive post-trial litigation, and the need for the independence of counsel. Strickland, 466 U.S. at 690, 104 S.Ct. 2052. The Strickland protocol was designed for a specific purpose: to ensure the regularity and fairness of a trial that has resulted in a criminal conviction.

Applying the Strickland test to the category of claims at bar would be illogical. Appellants are not arguing individual claims of ineffective assistance of counsel. Appellants point to no specific instances in which an attorney failed to provide constitutionally effective stewardship. Rather, Appellants' claim centers upon the widespread and endemic inability of the OPD's attorneys to provide counsel to indigent defendants. Appellants assert that the OPD lacks the number of attorneys and staff necessary to manage the large and increasing caseload in Luzerne County. The attorneys that the OPD does employ are so constrained in time and resources that they cannot provide the basic services that sustain and foster the attorney client relationship, and cannot devote the effort necessary to investigate and defend against the prosecution's case. These general allegations in no way resemble the individual ineffectiveness claims that the Court considered in Strickland. There is no performance by individual counsel to evaluate, nor is there a trial, the reliability of which might be questioned. There are

no interests in avoiding a retrial, nor are there any decisions made by counsel that warrant deference. Appellants are challenging whether Luzerne County, via its funding, is meeting Gideon's mandate in the first instance. This is a structural claim, not an individual one.

■ Strickland addresses only one aspect of the right to counsel: whether the right to counsel was violated such that the outcome of the trial was affected. However, the right to counsel "must mean more than just the right to an outcome." Duncan, 774 N.W.2d at 126. Other harms result from the constructive denial of counsel notwithstanding the fact that they do not affect the ultimate outcome of the case. As the Supreme Court recently noted in Laffler v. Cooper, Sixth Amendment remedies should be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." 566 U.S. 156, 132 S.Ct. 1376, 1388, 182 L.Ed.2d 398 (2012) (quoting United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)). There is no way to tailor Strickland to the remedy sought by Appellants, who seek prospective relief, not a new trial. "[A] suit for an injunction deals primarily, not with past violations, but with threatened future ones; and [ ] an injunction may issue to prevent future wrong, although no right has yet been violated." Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928). Prospective relief is available to protect certain rights, such as the right to counsel, even if the claims asserted by Appellants might not affect the outcome of all future trials.

In its many aspects, the fundamental right to counsel requires more than one available remedy. Moreover, harm from a violation of the right to counsel, in the form of actual or constructive denial of counsel, is not limited to the post-conviction context. Having reviewed the applicable precedents and the arguments of the parties, we find no barrier to the claims pursued by Appellants in this case. The right to counsel is the lifeblood of our system of criminal justice, and nothing in our legal tradition or precedents requires a person seeking to vindicate that right to wait until he or she has been

convicted and sentenced. To so hold would undermine the essentiality of the right during the pretrial process. It would render irrelevant all deprivations of the right at the earliest stages of a criminal process so long as they do not clearly affect the substantive outcome of a trial. If the right to counsel is to mean what the Supreme Court has consistently said it means, this view cannot prevail. A person has the same right to counsel at a preliminary hearing as he or she does at a sentencing hearing. It would confound logic to hold that the person can only seek redress for the latter stages of the criminal process.

## III. Application

■ We turn now to application of the O'Shea test to the averments in Appellants' amended complaint. Although Appellants did not structure the claims in the amended complaint according to O'Shea, it is clear to us that they have alleged facts sufficient to overcome Appellees' demurrer. Whether Appellants can prove their allegations at trial, or even whether Appellants can produce sufficient information to overcome a motion for summary judgment, are matters for another day, and do not factor into our decision.

As discussed above, in the amended complaint, Appellants identified six components of adequate "legal representation," and detailed how the OPD, due to the alleged insufficient funding, failed in each instance. Appellants asserted that the OPD could not train attorneys in the relevant, developing law, nor was the OPD able to fund mandatory continuing legal education training for its capital attorneys. Trial attorneys, untrained in appellate practice, were required to appeal their own cases, which often resulted in missed deadlines, waived issues, and unpersuasive arguments. Appellants asserted that OPD attorneys were unable to appear on behalf of clients at preliminary arraignments. Their absence resulted in clients receiving higher bail orders than necessary, serving prolonged and unnecessary pretrial incarceration, and being read a list of charges that the clients did not understand.

Appellants asserted that the mounting caseload that saddled the OPD's attorneys prevented those attorneys from appearing at hearings, or required multiple postponements. The delays increased the anguish and anxiety attending those facing criminal charges. More importantly, the delays unnecessarily extended pretrial incarceration. The attorneys' time was so taxed by their caseload, Appellants claimed, that, even when the attorneys were available, they were often unprepared and unable to provide meaningful advice. The same time constraints precluded the attorneys from investigating the facts and defenses of each case, and rendered them incapable of advising clients regarding constitutional rights and the effects that flow from decisions such as whether to plead guilty or whether to testify at trial.

Appellants also alleged that the attorneys' lack of time often resulted in insistence upon plea bargains that were unfavorable to the defendant or unsupported by law or fact. The OPD similarly lacked the investigatory resources to perform functions necessary to assist the attorneys. Further, the investigators that the OPD did employ often could not provide investigative services because they were too busy performing administrative tasks that resulted from the OPD's lack of support staff.

As well, Appellants averred that the OPD's attorneys did not have the time or resources to conduct jail visits or in-person, confidential communications with their clients. The attorneys were forced to conduct video-conferences, which lacked the confidentiality necessary to form and maintain attorney-client relationships. There was no sustained, meaningful communication between attorneys and the indigent clients.

Appellants also contended that the attorneys, due to the lack of personnel and time, routinely missed filing deadlines, and often filed documentation without first completing a full review of the case materials and conducting a meaningful interview with the client. Similarly, trial preparation, when it occurred, was conducted at the last minute, too late to uncover and investigate potentially meritorious defenses.

At this stage, we must accept these factual allegations as true. See Robinson Twp., *supra,* n.1. So viewed, it is evident that Appellants have alleged that, on a system-wide basis, the traditional markers of representation being provided by the OPD either are absent or significantly compromised. Furthermore, the limitations, and in some cases absences, of counsel are a result of the substantial structural deficiencies that result from a lack of adequate funding. Consequently, Appellants have demonstrated the "likelihood of substantial and immediate irreparable injury," and have stated a claim upon which relief can be granted. Further, based upon our discussion above, it also is clear that Strickland is not an available source of relief, and that no other remedy at law exists to redress Appellants' claims.

Appellees concede that the O'Shea test is applicable to Appellants. However, Appellees maintain that Appellants cannot satisfy the first prong of that test, principally because the injuries cited by Appellants are conjectural and based only upon abstract injury. This argument ignores the language of the O'Shea test. When seeking prospective relief, a plaintiff need not prove actual injury. That plaintiff must only demonstrate "the likelihood" of the injury. Hence, the fact that Appellants cannot point to a specific instance of an indigent client being actually deprived of the right to counsel is not fatal to the claim. Appellants have demonstrated that the system-wide deficiencies have created circumstances in which the constructive denial of counsel is imminent and likely, if not all but certain.

We have no doubt that Luzerne County is not alone in facing budgetary limitations, and that the OPD is not the only public defender's office that faces financial constraints. It is fair to say that both entities are not outliers in Pennsylvania. We recognize that our decision could prompt similar lawsuits in many of Pennsylvania's sixty-seven counties. However, the potential burden of such litigation cannot outweigh our Commonwealth's obligation to comply meaningfully and completely with Gideon. Our "inherent authority to ensure that indigent defendants receive constitutionally adequate assistance of

counsel," Commonwealth v. McGarrell, 624 Pa. 625, 87 A.3d 809, 810 (2014) (per curiam) (Saylor, J., dissenting) (quoting State v. Young, 143 N.M. 1, 172 P.3d 138, 140 (2007)), and our obligation to assure that appointed counsel amounts to more than a mere formality, trump the correlative burden of litigation.

Moreover, the prospect that additional lawsuits could follow our decision arises largely from the fact that Pennsylvania holds the dubious distinction of being the only state in the nation that continues to rely exclusively upon local, rather than state-wide, funding of public defender's offices. See Nat'l Right to Counsel Comm., Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel, CONST. PROJECT at 54 (2009).[9] This funding structure necessarily leads to variations in the availability and quality of indigent representation from one county to the next. At the most fundamental level, compliance with Gideon should not—cannot—depend upon the county in which a crime is alleged. It is no surprise that statewide funding lies "at the core of nearly every reform recommendation" pertaining to improving the quality of indigent defense. See McGarrell, 87 A.3d at 811 n.3 (citing Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel, supra at 11-12). In any event, we are not free to disregard the central role that the right to counsel plays in a system of justice predicated upon the fairness of trials merely because lawsuits may be brought to enforce that right.

Now that we have recognized the viability of a cause of action for prospective injunctive relief seeking additional funding, we also must consider the second question upon which we granted review. This issue effectively requires us to determine whether a writ of mandamus is a viable remedy for Appel-

9. In 2009, when Justice Denied was published, Utah also required counties exclusively to fund public defender's offices. On March 22, 2016, Utah's governor signed into law a bill that, inter alia, established a commission to review the adequacy of indigent representation and appropriated state funds to provide grants to Utah counties who shoulder the financial cost of providing counsel to indigent defendants. See Utah Code §§ 77-32-801-810 (effective May 10, 2016).

lants' claims. On this point, Appellants argue that courts possess the authority to issue the writ to compel Luzerne County to fund the OPD. Appellants recognize that a writ of mandamus is an extraordinary remedy, because it works to compel a public official to perform a certain action. Nonetheless, Appellants maintain that the importance of their claims justifies issuance of the writ.

Appellants first argue that the Public Defender Act imposes a duty upon a county to create a public defender's office, staffed with a chief public defender and outfitted with the equipment necessary to function in accordance with constitutional requirements. According to Appellants, funding is essential to carrying out this statutory obligation. Hence, indigent defendants have a clear right to an operational public defender's office, one in which the attorneys can provide constitutionally effective representation on a system-wide basis.

Appellees argue that Appellants have not, and cannot, prove an entitlement to a writ of mandamus because funding, regardless of its purpose, is a discretionary act. The right to mandamus arises only to direct a governmental official to perform an act as to which there is a clear legal duty. According to Appellees, no one has a clear legal right to a discretionary act. Appellees maintain that "the judicial branch, as an independent branch of government, has inherent power to compel the legislative branch to furnish sufficient funds for reasonable judicial functioning only in exceptional cases in which underfunding poses a genuine threat **to the judiciary's ability to adequately administer justice.**" Brief for Appellees at 38 (emphasis in original) (citing Jiuliante v. County of Erie, 540 Pa. 376, 657 A.2d 1245, 1250 (1995)). The judiciary otherwise lacks the general power to direct funding, even based upon a purported statutory obligation. The request for funding in this case does not affect Luzerne County's ability to administer justice. At best, Appellees allege, the funding affects the OPD's ability to function. Finally, Appellees maintain that Appellants can seek other remedies for their claims, including

seeking relief for individual claims of ineffective assistance of counsel under the PCRA.

The Commonwealth Court held that mandamus was not an available form of relief. The court determined that Appellants had not demonstrated a clear right to relief. Moreover, in line with Appellees' argument, the court concluded that Appellants could seek relief under Strickland or the PCRA to remedy any instances of constitutionally ineffective assistance of counsel. The court further explained that Luzerne County's budgetary decisions are inherently discretionary, and, therefore, are not subject to judicial compulsion through writs of mandamus. Flora, 103 A.3d at 138.

The Commonwealth Court also noted that "the writ of mandamus sought in the amended complaint may violate the doctrine of separation of powers." Id. The court explained that each branch of government, independent and co-equal with one another, possesses the authority to exercise functions that generally are immune from intrusion by the other branches. The judiciary, for instance, only may direct a legislative body to provide funding when the lack thereof makes it impossible to comply with statutory or constitutional obligations, and only when there is a "genuine threat to the administration of justice, that is, a nexus between the legislative act and the injury to the judiciary, not merely a theoretical encroachment by the legislature." Id. at 138 (quoting Beckert v. Warren, 497 Pa. 137, 439 A.2d 638, 643 (1981)). The "lack of an appropriation must, itself, be an unconstitutional omission." Id. With these standards in mind, the Commonwealth Court held that Appellants had failed in the amended complaint to aver such "an extreme refusal of [Luzerne County] to appropriate funds." Id. at 139. The court concluded that the amended complaint failed to elevate the contested funding from a discretionary act to a constitutional obligation. Id.

██ Ultimately, we agree with the Commonwealth Court and Appellees that the writ of mandamus is not an available remedy in this case, albeit for quite different reasons. "Mandamus is an extraordinary writ that will only lie to compel

official performance of a ministerial act or mandatory duty where there is a clear legal right in the plaintiff, a corresponding duty in the defendant, and want of any other appropriate and adequate remedy." Jackson v. Vaughn, 565 Pa. 601, 777 A.2d 436, 438 (2001) (citation omitted).

> While this Court has said that mandamus will not lie to compel discretionary acts, this has usually been interpreted to mean that while a court may direct that discretion be exercised, it may not specify **how** that discretion is exercised nor require the performance of a particular discretionary act. The writ cannot be used to control the exercise of discretion or judgment by a public official or administrative or judicial tribunal; to review or to compel the undoing of an action taken by such an official or tribunal in good faith and in the exercise of legitimate jurisdiction, even though the decision was wrong; to influence or coerce a particular determination of the issue involved; or to perform the function of an appeal or writ of error. We have indicated that the writ should not be granted in doubtful cases, and that it entails the application of equitable principles by the court asked to issue the writ.

> In short, mandamus is chiefly employed to compel the performance (when refused) of a ministerial duty, or to compel action (when refused) in matters involving judgment and discretion. It is not used to direct the exercise of judgment or discretion in a particular way, nor to direct the retraction or reversal of an action already taken. Mandamus is a device that is available in our system to compel a tribunal or administrative agency to act when that tribunal or agency has been sitting on its hands. It must not be turned into a general writ of error or writ of review lest we further encourage interlocutory and piecemeal appellate review, or multiple appeals with their attendant burdens and delays.

Penn. Dental Ass'n v. Commonwealth Ins. Dep't, 512 Pa. 217, 516 A.2d 647, 652 (1986) (internal citations and quotation marks omitted; emphasis in original).

■ We need not delve into the more complicated questions of whether the requested funding in this case exclusively is a discretionary act or whether compelling a county to provide funding would violate separation of powers. Indeed, we do not need to consider the first two mandamus requirements, because the issue readily may be resolved by considering only the final requirement. As noted, to be entitled to a writ of mandamus, in addition to the other requirements, Appellants must demonstrate that there is no other adequate or appropriate remedy at law. We reject Appellants' arguments for mandamus simply because there is another remedy at law: the cause of action that we have recognized earlier in this opinion. If Appellants ultimately can prove that they are entitled to injunctive relief, the remedy afforded will be the same as if a court issued a writ of mandamus: increased funding. Hence, the fact that the cause of action provides constructively the same remedy as plaintiffs seek in mandamus, as such, renders a writ of mandamus unavailable to Appellants.

## IV. Conclusion

We recognize for the first time in Pennsylvania a prospective cause of action enabling indigent criminal defendants to prove that the level of funding provided by a county to operate a public defender's office has left that office incapable of complying with Gideon, creating the likelihood of a systematic, widespread constructive denial of counsel in contravention of the Sixth Amendment to the United States Constitution. We further hold that Appellants have sufficiently averred facts to state a claim upon which injunctive relief can be granted. Because the Commonwealth Court held otherwise, we reverse that portion of the Commonwealth Court's decision.

In light of our recognition of this new cause of action, Appellants have a viable legal avenue for the relief that they seek. As such, the writ of mandamus is not available to Appellants. We affirm the portion of the Commonwealth Court's decision holding the same.

The case is remanded to the trial court for proceedings consistent with this opinion. Jurisdiction is relinquished.

Chief Justice Saylor and Justices Todd, Donohue and Dougherty join the opinion.

Justice Baer files a concurring opinion.

Justice Baer, Concurring.

I concur in the result. Like the Majority, I would reverse the Commonwealth Court's order and remand the case to the trial court for further proceedings, as I too conclude that Appellants' amended complaint avers sufficient facts to survive Appellees' preliminary objection in the nature of a demurrer. However, the rationale I employ in reaching this conclusion differs significantly from the Majority's reasoning. More specifically, in my view, the disposition of this appeal requires a straight-forward application of well-settled principles of law regarding mandamus actions and the standards that govern preliminary objections.

The crux of Appellants' amended complaint is that Luzerne County's failure to fund adequately the county's Office of Public Defender ("OPD") has rendered the OPD incapable of providing indigent defendants with effective assistance of counsel.

In terms of relief, Appellants requested as follows:

A writ of mandamus and permanent injunction compelling [Appellees] to provide necessary funding to allow the OPD to hire additional trial attorneys and support staff as well as upgrade the physical and technological resources such that the OPD is capable of providing representation to all qualified indigent defendants prosecuted in Luzerne County that satisfies standards set by the U.S. and Pennsylvania Constitutions[.]

Amended Complaint, 5/15/2016, at 38.

Regarding their request for injunctive relief, Appellants seek an order compelling Appellees to perform an affirmative act and mandating a course of conduct which would result in

an adequately funded OPD. Accordingly, Appellants desire a mandatory injunction. See BLACK'S LAW DICTIONARY 800 (8th ed. 2004) (defining "mandatory injunction" as an "injunction that orders an affirmative act or mandates a specified course of conduct").[1]

However, Appellees are Luzerne County (a government entity) and its county manager (a government official). Consequently, if the trial court were to grant Appellants' request for a mandatory injunction and require Appellees to fund the OPD appropriately, then it necessarily would be compelling official performance of an allegedly mandatory duty. Thus, for all intents and purposes, the only relief Appellants actually seek is a writ of mandamus. See Fagan v. Smith, 615 Pa. 87, 41 A.3d 816, 818 (2012) ("The writ of mandamus exists to compel official performance of a ministerial act or mandatory duty."); see also Sodus Cent. Sch. Dist. v. Kreps, 468 F.Supp. 884, 885 (W.D.N.Y. 1978) (stating that, when a plaintiff seeks a mandatory injunction against a government official, "it is a suit in the nature of mandamus and all of the common law restrictions on the use of mandamus is applicable"); Vann v. Hous. Auth. of Kansas City, Mo., 87 F.R.D. 642, 668 (W.D. Mo. 1980) ("When a mandatory injunction against a government official is sought, all of the common law restrictions on mandamus apply."). I, therefore, am of the opinion that we must view this matter as a mandamus action.

1. I also highlight that Appellants' complaint seeks a permanent, not a preliminary, injunction. This Court has explained that, in Pennsylvania, a court may issue a permanent injunction if the party seeking it can establish a clear right to relief. Bd. of Revision of Taxes, City of Philadelphia v. City of Philadelphia, 607 Pa. 104, 4 A.3d 610, 627 (2010). The Court further has explained that a party seeking a permanent injunction is not required to prove either irreparable harm or the need for immediate relief, "as is necessary when seeking a preliminary injunction[.]" Id.

The Majority concludes that, in order for Appellants to establish their right to injunctive relief, they must demonstrate "the likelihood of substantial and immediate irreparable injury[.]" Majority Opinion at 744 (quoting O'Shea v. Littleton, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). In terms of Pennsylvania law, it seems that such a requirement is more akin to the standard for a preliminary injunction than it is to the standard for a permanent injunction.

Moving forward and as relevant to this appeal, Appellees filed preliminary objections in the nature of a demurrer, claiming that Appellants' complaint fails to state a cause of action. The trial court sustained the objection, and the Commonwealth Court affirmed that decision. This Court granted allowance of appeal to review these decisions.

In order to determine whether the trial court properly sustained Appellees' preliminary objection in the nature of a demurrer, we must decide whether, based upon the facts pleaded in Appellants' complaint, it is clear and free from doubt that Appellants will be unable to prove facts legally sufficient to establish a right to mandamus relief. See Mazur v. Trinity Area Sch. Dist., 599 Pa. 232, 961 A.2d 96, 101 (2008) (stating that, in examining the propriety of an order sustaining a preliminary objection in the nature of a demurrer, an appellate court's standard of review is de novo, and its scope of review is plenary; and further explaining that a court "may sustain preliminary objections only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief"). In performing this task, we must accept as true all well-pleaded facts alleged in the complaint and every inference that is fairly deducible from those facts. Id.

As to a cause of action in mandamus, it is well-settled that a court may issue a writ of mandamus only where the party seeking the writ has a clear legal right, the responding public official has a corresponding duty, and no other adequate and appropriate remedy at law exists. Fagan, 41 A.3d at 818. Moreover, this Court has explained that mandamus can compel the performance of an official duty, "even where the existence and scope of such duties must be found and defined in the course of the mandamus action itself." Delaware River Port Auth. v. Thornburgh, 508 Pa. 11, 493 A.2d 1351, 1355 (1985).

First, I conclude that, when viewed in the proper light, the amended complaint contains sufficient facts to demonstrate that Appellants have a clear legal right. Specifically, it is indisputable that criminal defendants are constitutionally enti-

tled to effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 685–87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (recognizing that a criminal defendant's right to counsel is the right to the effective assistance of counsel). Appellants' complaint avers facts which, if believed, establish that they are indigent criminal defendants entitled to effective assistance of counsel.

Next, the amended complaint pleads facts sufficient to demonstrate that Appellees have a duty which corresponds with Appellants' right to effective assistance of counsel. In this regard, the amended complaint accurately highlights that, pursuant to the Public Defender Act ("Act"),[2] save for Philadelphia, every county in Pennsylvania must appoint a public defender, 16 P.S. § 9960.3, who by statutory mandate must furnish legal counsel to any person who lacks sufficient funds to obtain legal counsel and who is facing criminal and related proceedings, id. at § 9960.6. To allow the public defender to accomplish this task, the Act provides him with the discretion, inter alia, to hire staff, id. at § 9960.5, and it requires the board of commissioners to provide the public defender with suitable office space, furniture, equipment, and supplies, id. at § 9960.9. Moreover, according to the amended complaint, Appellees are responsible for providing funding to the OPD so that ODP can fulfill its duties to indigent criminal defendants.

In my view, Appellants' accurate legal statements, combined with their factual averments, are sufficient to demonstrate that Appellees have a duty to fund adequately the OPD, which corresponds with Appellants' legal right to effective assistance of counsel. Moreover, as detailed by the Majority, the amended complaint is chock-full of allegations that Appellees have failed to fulfill this duty.

The last question is whether the amended complaint avers facts sufficient to establish that no other adequate and appropriate remedy at law exists. In their amended complaint, Appellants plead that they have no other adequate remedy at law. Amended Complaint, 5/15/2016, at ¶ 111. Stated succinct-

2. 16 P.S. §§ 9960.1-9960.13.

ly, in my view, the remainder of the facts averred in the complaint supports this statement.[3] Thus, that element is properly plead.

For these reasons, the trial court erred by sustaining Appellees' demurrer. I must highlight, however, that the rather simplistic manner in which I believe this appeal should be decided is dictated by the procedural posture of this case. Pleading sufficient facts to survive a preliminary objection in the nature of a demurrer is a rather low legal hurdle to clear. Providing evidence to substantiate those facts and proving the necessity of a writ of mandamus are far more challenging obstacles. Indeed, it is well-settled that mandamus is an extraordinary writ. See, e.g., Chilli v. Sch. Dist. of City of McKeesport, 334 Pa. 581, 6 A.2d 99, 99 (1939) ("Mandamus is not a remedy of absolute right, it is an extraordinary writ, discretionary with the court, and can only be obtained when there is a clear legal right in the relator and a positive duty of the defendant to be performed, and where there is no other adequate, specific or appropriate remedy; mandamus can never be invoked in a doubtful case.").

Furthermore, assuming *arguendo* that Appellants ultimately can meet these high standards, fashioning a legally sound judgment will present unique problems. Such a judgment only could require Appellees to provide funding that meets minimum requirements necessary to allow the OPD to provide effective assistance of counsel, as that term is well-defined in cases involving collateral attacks on judgments of sentence. See, e.g., Commonwealth v. Pierce, 567 Pa. 186, 786 A.2d 203 (2001).

In addition, a judgment in Appellants favor must be crafted in such a way that it does not necessitate the courts to

---

3. As detailed by the Majority Opinion, Appellees argue that the Post Conviction Relief Act, ("PCRA"), 42 Pa.C.S. §§ 9541-9546, provides a remedy for successful claims of ineffective assistance of counsel. This is true. However, the PCRA does not offer a vehicle to bring the specific cause of action that Appellants present in this matter nor does it contain a remedy that would allow for the relief that Appellants seek. Consequently, the PCRA does not supply Appellants with an adequate or appropriate remedy at law.

maintain continuous oversight over the manner in which the OPD is funded. See Dorris v. Lloyd, 375 Pa. 474, 100 A.2d 924, 927 (1953) ("The ordinary office of the writ of mandamus is to coerce the performance of single acts of specific and imperative duty, . . . and ordinarily it is not an appropriate remedy to compel a general course of official conduct or a long series of continuous acts, to be performed under varying conditions . . . ."). In any event, today we simply are presented with determining whether Appellants' complaint survives Appellees' preliminary objection in the nature of a demurrer, and the Court has held that it does.